[Crim. No. 24586. July 31, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
JOAQUIN BARNES, Defendant and Appellant.

COUNSEL

Frank O. Bell, Jr., State Public Defender, Philip M. Brooks, Deputy State Public Defender, and John Nash for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Ann K. Jensen, Dane R. Gillette and Stan M. Helfman, Deputy Attorneys General, for Plaintiff and Respondent.

Christopher N. Heard as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**BIRD, C. J.**—Was the Court of Appeal correct in relying on a rape complainant's lack of "measurable resistance" to overturn convictions of rape and false imprisonment as unsupported by sufficient evidence?

### I.

Since the sufficiency of evidence to support the convictions is in issue, it is necessary to present a somewhat detailed statement of the factual circumstances of this case.

Marsha M. had known appellant about four years as of May of 1982. They were neighbors and acquaintances. She had been to his house briefly once before to buy some marijuana. A couple of weeks before the present incident, they had drunk wine together at her house.

Around 10 p.m. on May 27, 1982, appellant called Marsha and invited her over for some drinks to celebrate his parents' having come into a sum of money. Marsha was undecided and told appellant to call back or she would call him.

Over the next two hours, appellant called twice to see what Marsha had decided to do. She finally told him she would come over and that she wanted to buy a little marijuana from him. She asked him to meet her outside his house.

Marsha arrived at appellant's house around 1 a.m. Appellant was waiting for her outside the front gate. It was cold. Appellant suggested they go inside and smoke some marijuana. At first Marsha refused. She told appellant she had to get up early and wanted to buy the marijuana and go home. However, after a couple of minutes, appellant persuaded her to come inside.

Marsha followed appellant through the house to a room off the garage.[1] At first, they carried on a conversation which Marsha described as "normal chatter." Appellant provided some marijuana and they both smoked it. Appellant offered some cocaine, but she refused. She kept telling appellant she wanted to hurry up and leave.

After 10 or 15 minutes, appellant began to hug Marsha. She pushed him away and told him to stop. She did not take him seriously as he was "just coming on."

Appellant continued his advances despite Marsha's insistence that she only wanted to buy marijuana and leave. When appellant asked her why she was in such a hurry, she reiterated she just wanted him to give her the

---

[1]Marsha described the house where appellant lived as having an iron gate that had to be opened in order to reach the front door. Once inside the house, a door to the right opened to some stairs which led to a room off the garage.

marijuana and let her go since she had to get up early in the morning. Appellant told her he did not want her to leave. Marsha finally said good-bye and walked out of the room. Until this point, things between them had been "decent and friendly."

As Marsha approached the front gate, appellant, who was behind her and appeared angry, stated, "No, you don't go leaving. You don't just jump up and leave my goddamn house." He began "ranting and raving" and arguing with her. He wanted to know why she was "trying to leave." He told her that she made him feel as if she had stolen something; that she was acting like he was "a rapist or something." Marsha characterized appellant's behavior as "psychotic."

When she reached the front gate, Marsha did not try to open it because she did not know how. She asked appellant to open it, but he just stood looking at her. This behavior made her nervous. When she asked appellant what was wrong, he "reared back" as if he were going to hit her.[2]

They argued at the gate for about 20 minutes.[3] Marsha told appellant she did not understand what he was arguing with her about and that he seemed to be trying to find a reason to be angry with her. She told him, "I came to your house to get some grass. Now, I want to leave. You won't let me leave."

Appellant replied that he was going to let her leave but needed to put his shoes on first. He then returned to the room and Marsha followed. She said she returned to the room because she felt she could not get out the front gate by herself.

As she was following appellant, the door leading to the stairs closed behind her, prompting him to shout that she was "slamming the goddamn door" in his house. After they entered the room, appellant closed the door behind them. He was "fussing" at Marsha, talking and "carrying on" the whole time he was putting on his shoes. He stated, "I don't know what the hell you bitches think you want to do." Marsha was confused and concerned about what was happening and about what appellant was going to do. Several times, appellant stopped talking and looked at her "funny."

Appellant then stood up and began to "lecture" Marsha. He was angry. He began to threaten her, telling her he was a man and displaying the

[2]Marsha testified that several times appellant reared back with fists raised and "balled up." She felt threatened by these gestures and believed he was going to hit her. The first time he "reared back" was during the argument at the front gate. She testified she did not think his fist was raised during this instance, but that he did "rear back" and look at her.

[3]During this argument, Marsha asked appellant several times to open the gate.

muscles in his arms. He grabbed her by her sweater collar and told her he could pick her up with one hand and throw her out. Flexing his muscles, he stated, "You see this? I am a man. You respect me like a man. I am no kid."

Appellant also told Marsha of his past sexual exploits. He stated: "I had bitches do anything I want. I have had bitches suck me . . . I have had them do that. I can make you do anything I want. You understand me?" Occasionally, appellant would stop talking, "rear back," look at her and tell her how much she upset him.

At one point appellant said, "You're so used to see [sic] the good side of me. Now you get to see the bad." Then he became quiet and stared at her. This statement again made Marsha believe he was going to hit her.

Marsha asked appellant whether he wanted to hit her. She told him she could not fight him. Appellant responded by lecturing her. Marsha began to move toward the door. When appellant noticed her, he said, "I don't know why you're standing by the door. What are you looking at the door for?" Marsha thought appellant pushed the door closed a little tighter.

Appellant continued talking but then suddenly turned and started hugging Marsha "affectionately." He told her he did not mean to "fuss" at her. By now, Marsha felt she was in the room with a "psychotic person" who had again changed personalities. Approximately 40 minutes had elapsed since they entered the room a second time. It was at this juncture that Marsha began to "play along" and feign compliance with appellant's desires.

In an effort to get out of appellant's house, Marsha suggested they go to her house where they could be alone. Appellant told her not to worry about his parents coming home. He continued to hug and talk to her. After a few minutes, appellant stated, "I have to have some of this right now," and told Marsha to remove her clothes. Marsha refused. Appellant reacted by telling her she was going to upset him and by making some type of gesture. In response, Marsha removed her clothes. An act of sexual intercourse ensued which lasted about one hour and included the exchange of kisses. Afterward, both appellant and Marsha fell asleep.

Marsha testified she engaged in sexual intercourse with appellant because she felt if she refused, he would become physically violent. She based this assessment on appellant's actions and words, including his statements that she was about to "see the bad side" of him and that he could throw her out if he wanted.

Marsha awoke around 4 a.m. She cajoled appellant into walking her to the front gate and opening it so she could leave. She returned home and immediately called Kaiser Hospital to request an examination. She was eventually referred to the sexual trauma center and examined for venereal disease.

Marsha did not report the incident to the police that day because she was confused and felt "it was my word against his." She had been told at the sexual trauma center that she had three days within which to make a report. After discussing the incident with a coworker, she reported it to the police the following day.

Appellant telephoned Marsha the morning of the incident and a couple of days later. On both occasions she hung up on him.

The defense was consent. Appellant's testimony was substantially similar to Marsha's regarding the events prior to her arrival at his house. However, the versions differed markedly as to the subsequent events.

Appellant testified that the first time they were in the room together he gave Marsha some marijuana and refused payment for it. They smoked some marijuana. Appellant told Marsha he had "feelings for her," he was sexually attracted to her and did not want her to leave so quickly. According to appellant, they did not argue over anything. He was surprised that she was in such a rush to leave.

At the front gate, they continued to talk. He again expressed feelings of sexual attraction for her. According to appellant, it was Marsha who first returned to the room. There, she told him she would stay a little while longer. Then, without being asked, she started removing her clothes. Consensual sexual intercourse ensued during which Marsha returned appellant's hugs and kisses. Appellant testified he did not threaten Marsha in any way, make gestures toward her, display his muscles or force her to stay. He confirmed the fact that he had telephoned Marsha twice afterwards. However, he testified they talked briefly each time.

Appellant was convicted after a jury trial of one count each of rape and false imprisonment (Pen. Code, §§ 261, subd. (2), 236)[4] as to Marsha M.[5] The Court of Appeal reversed these convictions as unsupported by substantial

---

[4]All statutory references are to the Penal Code unless otherwise noted.

[5]Appellant was also convicted of one count of assault with intent to commit rape (§ 220) as to Stacey B., an incident unrelated to the one involving Marsha M.

Neither party contests the Court of Appeal's affirmance of the assault conviction. Therefore, it is unnecessary to discuss the facts of that offense.

evidence. This court granted the Attorney General's petition for review in order to clarify the requirements for conviction under section 261, subdivision (2) as amended by the Legislature in 1980.

## II.

Until its amendment in 1980, former section 261, subdivisions 2 and 3 defined rape as an act of sexual intercourse under circumstances where the person resists, but where "resistance is overcome by force or violence" or where "a person is prevented from resisting by threats of great and immediate bodily harm, accompanied by apparent power of execution . . . ."[6]

The Legislature amended section 261 in 1980 to delete most references to resistance. (Stats. 1980, ch. 587, § 1, p. 1595.)[7] In pertinent part, the statute now defines rape as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances: . . . [¶] (2) Where it is accomplished against a person's will by means of force or fear of immediate and unlawful bodily injury on the person or another."[8]

---

[6]Former section 261 provided in full: "Rape is an act of sexual intercourse, accomplished with a person not the spouse of the perpetrator, under any of the following circumstances:

"1. Where a person is incapable, through lunacy or other unsoundness of mind, whether temporary or permanent, of giving legal consent;

"2. Where a person resists, but the person's resistance is overcome by force or violence;

"3. Where a person is prevented from resisting by threats of great and immediate bodily harm, accompanied by apparent power of execution, or by any intoxicating, narcotic, or anaesthetic substance, administered by or with the privity of the accused;

"4. Where a person is at the time unconscious of the nature of the act, and this is known to the accused;

"5. Where a person submits under the belief that the person committing the act is the victim's spouse, and this belief is induced by any artifice, pretense, or concealment practiced by the accused, with intent to induce such belief."

[7]Subdivision (3) of the amended statute retains a reference to the prevention of resistance through the administering of certain substances.

[8]The full text of present section 261 provides: "Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances:

"(1) Where a person is incapable, because of mental disease, defect, or disorder or because of physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the act. Notwithstanding the existence of a conservatorship pursuant to the provisions of the Lanterman-Petris-Short Act (Part I (commencing with Section 5000) of Division 5 of the Welfare and Institutions Code), the prosecuting attorney shall prove, as an element of the crime, that a mental disease, defect, or disorder or physical disability rendered the alleged victim incapable of giving consent.

"(2) Where it is accomplished against a person's will by means of force or fear of immediate and unlawful bodily injury on the person or another.

"(3) Where a person is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, administered by or with the privity of the accused.

"(4) Where a person is at the time unconscious of the nature of the act, and this is known

 The events in this case occurred on May 28, 1982. Therefore, appellant was charged, tried and convicted under section 261, subdivision (2) as amended in 1980. In the Court of Appeal, appellant argued that the evidence was insufficient to sustain his conviction of rape under that statute. Inexplicably, the Court of Appeal quoted and relied upon the language from *People* v. *Nash* (1968) 261 Cal.App.2d 216, 224 [67 Cal.Rptr. 621], which reiterated the requirements of rape prior to the 1980 amendment to section 261: "The offense of rape is committed when the victim resists the act, but her resistance is overcome by force or violence. (Pen. Code, § 261, subd. 3.)[9] Although she must resist in fact, an extraordinary resistance is not required. The amount of resistance need only be such as to manifest her refusal to consent to the act. [Citation.]"

Using the defunct *Nash* formula as its analytical foundation, the Court of Appeal proceeded to review the evidence in light of certain facts which bore mainly on the existence *vel non* of resistance by Marsha and of threats by appellant. It concluded that (1) "at no time did [appellant] specifically threaten physical harm to Marsha unless she consented to an act of intercourse"; (2) "Marsha removed her clothes and acceded to his demands *without any explicit protestation or measurable resistance* to appellant's advances"; (3) the record does not contain "credible evidence of solid value from which an inference can be made beyond a reasonable doubt that appellant intended to have intercourse with Marsha *irrespective of her protestations or passive resistance*"; and (4) the record shows only "Marsha's *bare assertion* of an *uncommunicated resistance* to the act in question." (Italics added.) On this basis, the Court of Appeal reversed appellant's conviction of rape.[10]

---

to the accused.

"(5) Where a person submits under the belief that the person committing the act is the victim's spouse, and this belief is induced by any artifice, pretense, or concealment practiced by the accused, with intent to induce the belief.

"(6) Where the act is accomplished against the victim's will by threatening to retaliate in the future against the victim or any other person, and there is a reasonable possibility that the perpetrator will execute the threat. As used in this paragraph 'threatening to retaliate' means a threat to kidnap or falsely imprison, or to inflict extreme pain, serious bodily injury, or death.

"(7) Where the act is accomplished against the victim's will by threatening to use the authority of a public official to incarcerate, arrest, or deport the victim or another, and the victim has a reasonable belief that the perpetrator is a public official. As used in this paragraph, 'public official' means a person employed by a governmental agency who has the authority, as part of that position, to incarcerate, arrest, or deport another. The perpetrator does not actually have to be a public official."

[9]Former subdivision 3 of section 261 was renumbered as subdivision 2 in 1970. (Stats. 1970, ch. 1301, § 1, p. 2405.)

[10]The Court of Appeal also reversed the conviction of false imprisonment as being attendant to the rape conviction.

It is undisputed that the Court of Appeal erred in applying the requirements of former section 261 to the facts of this case. At no time prior to the appellate opinion had it been suggested that the language of former section 261 be resurrected and applied to the facts of this case. The controlling statute was and is clearly the one in effect at the time the offense occurred and under which appellant was convicted. The Court of Appeal's reliance on former section 261 to reverse appellant's conviction for rape was entirely misplaced.

As noted, present section 261, subdivision (2) contains no reference to resistance by the prosecuting witness or to threats by the accused. Relying on *People* v. *Pacheco* (1886) 70 Cal. 473 [11 P. 761] and *People* v. *Snyder* (1888) 75 Cal. 323 [17 P. 208] (overruled in *People* v. *Collins* (1960) 54 Cal.2d 57, 59 [4 Cal.Rptr. 158, 351 P.2d 326], see also *People* v. *Lohbauer* (1981) 29 Cal.3d 364, 371-372 [173 Cal.Rptr. 453, 627 P.2d 183]), appellant now argues that the Legislature's 1980 deletion of references to resistance from subdivision (2) did not change the definition of rape since resistance was never an "element" of the crime of rape. He contends that although the Legislature may have intended to eliminate the resistance requirement, the amendment was unnecessary since resistance was never required. Therefore, he concludes, the amendment had no impact on the factors a court may use in evaluating a claim of insufficiency of the evidence.

Neither *Pacheco* nor *Snyder* stands for the proposition that resistance was not an element of the crime of rape. *Pacheco* merely held that the failure to allege resistance in an accusatory pleading, where notice to the accused is the primary concern, does not render the pleading fatally defective. (*Pacheco, supra,* 70 Cal. at pp. 473-474.) Similarly, *Snyder* held that there was no fatal variance between the information and the proof when the information charged rape by force or violence and the proof showed commission by other means. That court did not address the "element" issue. (*Snyder, supra,* 75 Cal. at pp. 323-325.)

Instead, it is clear that in a rape prosecution involving force or violence under former section 261, subdivision 2, resistance *was* a crucial and necessary circumstance to be proved before the trier of fact. (*People* v. *Nash, supra,* 261 Cal.App.2d at p. 224; see *ante,* fn. 6.) "Under the code, proof of resistance on the part of the female until overcome by force or violence *is essential* [citations] . . . ." (*People* v. *Brown* (1934) 138 Cal.App. 748, 750 [33 P.2d 460], italics added; 22 Cal.Jur., Rape, § 42, p. 398; see also *People* v. *Brown* (1874) 47 Cal. 447.)

The importance of resistance lay in its relationship to the issues of force and consent. (*People* v. *Newlan* (1959) 173 Cal.App.2d 579, 581 [343 P.2d

618].) The accused's conduct became criminal only if the complainant failed to consent, exhibited resistance, and was overcome in this will by the accused's use of force or violence. By establishing resistance, the state was able to prove the key elements of the crime: the accused's intent to use force in order to accomplish an act of sexual intercourse, and the woman's nonconsent. (*People* v. *Norrington* (1921) 55 Cal.App. 103, 110 [202 P. 932].) Thus, even assuming appellant is semantically correct that resistance was not an "element" of the offense of rape, this court cannot, as he urges, dismiss its elimination in the 1980 amendment to subdivision (2) as unnecessary or insignificant.

■ Moreover, the amendment's deletion of references to resistance carries with it a presumption that a material change was intended. "It is ordinarily to be presumed that the Legislature by deleting an express provision of a statute intended a substantial change in the law. [Citation.]" (*People* v. *Valentine* (1946) 28 Cal.2d 121, 142 [169 P.2d 1]; *Loew's Inc.* v. *Byram* (1938) 11 Cal.2d 746, 750 [82 P.2d 1].) This presumption is strongly buttressed in this instance not only by the legislative history and the circumstances surrounding the enactment of the amendment (see *People* v. *Black* (1982) 32 Cal.3d 1, 5 [184 Cal.Rptr. 454, 648 P.2d 104]; *California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836]), but also by the impact the amendment has had on the role of resistance in the fact-finding process as well.

The bill which enacted the 1980 amendment to section 261 into law was Assembly Bill No. 2899. (2 Assem. Final Hist. (1979-1980 Reg. Sess.) p. 1672.) In the digest which appeared at the beginning of each version of the bill, the Legislative Counsel noted the amendment would *delete* "the element of resistance." (See, e.g., Legis. Counsel's Dig., Assem. Bill No. 2899, 4 Stats. 1980 (Reg. Sess.) Summary Dig., p. 158; see also *People* v. *Salazar* (1983) 144 Cal.App.3d 799, 807 [193 Cal.Rptr. 1].) Therefore, on the face of each version of the bill, the Legislature was informed of its purpose.

Further insight into the purpose of Assembly Bill No. 2899 can be garnered from the analysis by the Assembly Committee on Criminal Justice (now called the Assembly Committee on Public Safety): "The main purpose of this bill is to eliminate the 'resistance' requirement in rape. Under current law, a woman must either resist or be prevented from resisting because of threats. According to the proponents, victims who resist are injured by the rapist twice as often as victims who don't resist. The proponents also indicate that prosecutors are unable and unwilling to file cases when the victim does not resist." (Assem. Com. on Crim. Justice, Analysis of Assem. Bill No. 2899 (1979-1980 Reg. Sess.) as amended Apr. 7, 1980, p. 1.)

One commentator, writing shortly after the amendment was enacted into law, stated that it "eliminates the resistance requirement," and "[a]pparently . . . will alleviate the evidentiary difficulties that impeded rape convictions under prior law" when there was little or no corroboration of the alleged victim's testimony that her resistance had been overcome by the accused. (*Review of Selected 1980 California Legislation, Crimes* (1980) 12 Pacific L.J. 321; see also *People* v. *Salazar, supra,* 144 Cal.App.3d at p. 807.) It is evident that the central issue facing the Legislature at the time of the 1980 amendment was the elimination of the resistance requirement.

Moreover, appellant is incorrect in asserting that the amendment made no change insofar as the significance of resistance is concerned. For the amendment has effected a crucial change in the fact-finding process. Prior to 1981, when an accused was charged with rape by means of force or violence, the jury was instructed, in accordance with the language of former section 261, subdivision 2, that the "element" of resistance must be proved. (Former CALJIC No. 10.00 (1979 rev.).)[11] By contrast, the 1982 revision of CALJIC No. 10.00[12] mirrored the statutory change and now allows the jury to convict of rape by force or fear under section 261, subdivision (2), without proof of victim resistance.[13]

Appellant's minimization of the 1980 amendment also ignores the crucial role the resistance requirement has played in the history of rape laws. That the Legislature's elimination of resistance represents a profound change in the law is evident from a review of its historical evolution.

---

[11]The 1979 revision of CALJIC No. 10.00 provided: "The crime of rape as charged against the defendant in this case is an act of sexual intercourse with a female person not the wife of the perpetrator, without her consent, *when she resists and her resistance is overcome by force or violence.*

"The resistance required is only such as to make it reasonably apparent she is unwilling to engage in an act of intercourse, taking into consideration the circumstances and the amount of force or violence exhibited by the perpetrator.

"In order to prove the commission of the crime of rape, *each of the following elements must be proved:*

"1. That a person engaged in sexual intercourse with a female,

"2. That the female was not his wife,

"3. That she did not consent to such act of intercourse, and

"4. *That she resisted such act but her resistance was overcome by force or violence.*" (Italics added.)

[12]Present CALJIC No. 10.00 (1982 rev.) reads in pertinent part: "In order to prove the commission of the crime of rape [by means of force or fear of immediate and unlawful bodily injury], each of the following elements must be proved:

"1. That the defendant engaged in an act of intercourse with a person,

"2. That such other person was [not] the spouse of the perpetrator,

"3. That the act of intercourse was against the will of such other person, and

"[4a. That the act was accomplished by means of force [or fear of immediate and unlawful bodily injury].]"

[13]Notably, the jury in appellant's case was instructed in the language of the 1982 revision of CALJIC No. 10.00.

At common law, the crime of rape was defined as "the carnal knowledge of a woman forcibly and against her will." (4 Blackstone, Commentaries 201.) Historically, it was considered inconceivable that a woman[14] who truly did not consent to sexual intercourse would not meet force with force. (Note, *Recent Statutory Developments in the Definition of Forcible Rape* (1975) 61 Va.L.Rev. 1500, 1505-1507 [hereafter *Forcible Rape*]; see, e.g., *Brown v. State* (1906) 127 Wis. 193, 201 [106 N.W. 536, 539].)[15] The law originally demanded "utmost resistance" from the woman to ensure she had submitted rather than consented. (Com., *Towards a Consent Standard in the Law of Rape* (1976) 43 U.Chi.L.Rev. 613, 619 [hereafter *Consent Standard*]; *Forcible Rape, supra,* 61 Va.L.Rev. at p. 1506.) Not only must she have resisted to the "utmost" of her physical capacity, the resistance must not have ceased throughout the assault. (*Forcible Rape, supra,* 61 Va.L.Rev. at p. 1506; see Perkins & Boyce, Criminal Law (3d ed. 1982) pp. 210-211.)

California long ago rejected this "primitive rule" of utmost resistance. (*People* v. *Norrington, supra,* 55 Cal.App. at pp. 108-111; *People* v. *McIlvain* (1942) 55 Cal.App.2d 322, 329 [130 P.2d 131], disapproved on other grounds in *People* v. *Brown* (1947) 29 Cal.2d 555, 560 [176 P.2d 929], but see *People* v. *Caudillo* (1978) 21 Cal.3d 562, 577-578 and 580, fn. 10 [146 Cal.Rptr. 859, 580 P.2d 274] [questioning *Brown*].) "A woman who is assaulted need not resist to the point of risking being beaten into insensibility. If she resists to the point where further resistance would be useless or, . . . until her resistance is overcome by force or violence, submission thereafter is not consent." (*McIlvain, supra,* 55 Cal.App.2d at p. 329.) In our state, it had long been the rule that the resistance required by former section 261, subdivision 2, was only that which would reasonably manifest refusal to consent to the act of sexual intercourse. (*People* v. *Hunt* (1977) 72 Cal.App.3d 190, 194 [139 Cal.Rptr. 675]; *People* v. *Ford* (1947) 81 Cal.App.2d 580, 582 [184 P.2d 524]; *People* v. *Cline* (1931) 117 Cal.App. 181, 184-185 [3 P.2d 575].)

Nevertheless, courts refused to uphold a conviction of rape by force where the complainant had exhibited little or no resistance. (See, e.g., *People* v. *Bales* (1946) 74 Cal.App.2d 732, 736 [169 P.2d 262] [rape conviction reversed where evidence insufficient to show any real resistance by complainant]; *People* v. *Jaramillo* (1934) 137 Cal.App. 232, 233-234 [30 P.2d

---

[14]Although the balance of this opinion frequently refers to the rape complainant as female, the discussion applies equally to male rape complainants.

[15]Thus, for example, in passing on a claim of rape, the court in *People* v. *Dohring* (1874) 59 N.Y. 374, 384 was prompted to query: "Can the mind conceive of a woman . . . revoltingly unwilling that this deed should be done upon her, who would not resist so hard and so long as she was able?"

427] [evidence held insufficient to sustain conviction of rape where protest by female was "feeble"]; see also *People* v. *Brown, supra,* 47 Cal. at p. 450 [evidence held insufficient to convict when resistance was absent or "of such equivocal character" as to indicate consent]; accord *People* v. *Fleming* (1892) 94 Cal. 308, 312-313 [29 P. 647].) The law demanded some measure of resistance, for it remained a tenet that a virtuous woman would by nature resist a sexual attack. (See *Forcible Rape, supra,* 61 Va.L.Rev. at p. 1508.)

The requirement that a woman resist her attacker appears to have been grounded in the basic distrust with which courts and commentators traditionally viewed a woman's testimony regarding sexual assault. (Schwartz, *An Argument for the Elimination of the Resistance Requirement from the Definition of Forcible Rape* (1983) 16 Loyola L.A. L.Rev. 567, 569-570 [hereafter·*Resistance Requirement*]; LeGrand, *Rape and Rape Laws: Sexism in Society and Law* (1973) 61 Cal.L.Rev. 919, 931 [hereafter *Rape and Rape Laws*].) According to the 17th century writings of Lord Matthew Hale, in order to be deemed a credible witness, a woman had to be of good fame, disclose the injury immediately, suffer signs of injury and cry out for help. (1 Hale, History of the Pleas of the Crown (1st Am. ed. 1847) p. 633.)

This distrust was formalized in the law in several areas. (See *Consent Standard, supra,* 43 U.Chi.L.Rev. at p. 616; Brownmiller, Against Our Will, Men, Women and Rape (1975) pp. 369-374.) For example, juries were traditionally advised to be suspect and cautious in evaluating a rape complainant's testimony, particularly where she was "unchaste." (See *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864, 871, 873-877 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845]; Letwin, *"Unchaste Character," Ideology, and the California Rape Evidence Laws* (1980) 54 So.Cal.L.Rev. 35, 38-39, 43-52 [hereafter *Unchaste Character*].)

In most jurisdictions, corroboration of the complaining witness was necessary for a conviction of rape. (See generally, Note, *Corroborating Charges of Rape* (1967) 67 Colum.L.Rev. 1137; Note, *The Rape Corroboration Requirement: Repeal Not Reform* (1972) 81 Yale L.J. 1365; but contrast *People* v. *Scott* (1978) 21 Cal.3d 284, 296 [145 Cal.Rptr. 876, 578 P.2d 123].) Skeptical of female accusers, the majority of courts and commentators considered it appropriate that the "prosecutrix" in all sexual assault cases undergo psychiatric examination before trial. (See, e.g., *Ballard* v. *Superior Court* (1966) 64 Cal.2d 159, 176-177 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416]; *Comment, Psychiatric Examinations of Sexual Assault Victims: A Reevaluation* (1982) 15 U.C. Davis L.Rev. 973, 975-976; Juviler, *Psychiatric Opinions as to Credibility of Witnesses: A Suggested Approach* (1960) 48 Cal.L.Rev. 648, 676.)

Such wariness of the complainant's credibility created "an exaggerated insistence on evidence of resistance." (*Consent Standard, supra,* 43 U.Chi.L.Rev. at p. 626.) As an objective indicator of nonconsent, the requirement of resistance insured against wrongful conviction based solely on testimony the law considered to be inherently suspect. In our state, it supplied a type of intrinsic corroboration of the prosecuting witness's testimony, a collateral demanded even when extrinsic corroboration was not required. Thus did the resistance requirement continue even in its modified form, to nurture and reflect the perspective, still held by some modern commentators, that "human nature will impel an unwilling woman to resist unlawful sexual intercourse with great effort." (Perkins & Boyce, *supra,* at p. 211.)

Recently, however, the entire concept of resistance to sexual assault has been called into question. (See generally Note, *Elimination of the Resistance Requirement and Other Rape Law Reforms: The New York Experience* (1983) 47 Alb.L.Rev. 871 [hereafter *Elimination of Resistance*]; *Resistance Requirement, supra,* 16 Loyola L.A. L.Rev. 567.) It has been suggested that while the presence of resistance may well be probative on the issue of force or nonconsent, its absence may not.

For example, some studies have demonstrated that while some women respond to sexual assault with active resistance, others "freeze." (See Queen's Bench Foundation, Rape Prevention and Resistance (1976) p. 18 [hereafter *QBF*]; Symonds, *The Rape Victim: Psychological Patterns of Response* (1976) 36 Am.J.Psychoanalysis 27, 29-33; Amir, Patterns in Forcible Rape (1971) pp. 163-164; *Resistance Requirement, supra,* 16 Loyola L.A. L.Rev. at p. 577.) One researcher found that many women demonstrate "psychological infantilism"—a frozen fright response—in the face of sexual assault. (Symonds, *supra,* 26 Am.J.Psychoanalysis at p. 30; see also *QBF, supra,* at pp. 18-20 [reporting that some women "freeze" and become helpless from panic and numbing fear].) The "frozen fright" response resembles cooperative behavior. (Symonds, *supra,* 26 Am.J.Psychoanalysis at p. 30.) Indeed, as Symonds notes, the "victim may smile, even initiate acts, and may appear relaxed and calm." (*Ibid.*) Subjectively, however, she may be in a state of terror. (*Ibid.*)[16] Symonds also reports that the victim may make submissive signs to her assailant and engage in propitiating behavior in an effort to inhibit further aggression. (*Id.,* at pp. 30-31.) These findings belie the traditional notion that a woman who does not resist has consented. They suggest that lack of physical resistance may reflect a "pro-

---

[16]Symonds writes: "In light of the traumatic psychological infantalism . . . that most victims of violent crime undergo, it is surprising we see any resisting patterns at all." (*Id.,* at p. 31.)

found primal terror" rather than consent. (*Id.*, at p. 30; see also Note, *Shifting the Communication Burden: A Meaningful Consent Standard in Rape* (1983) 6 Harv. Women's L.J. 143, 148, fn. 29.)

Additionally, a growing body of authority holds that to resist in the face of sexual assault is to risk further injury. (*Elimination of Resistance, supra,* 47 Alb.L.Rev. at p. 872; United States Dept. of Justice, Forcible Rape: A National Survey of the Response by Prosecutors (1977) vol. 1, pp. 14-15 [reporting that the likelihood of receiving injuries requiring medical treatment nearly doubled when victims resisted assailants]; *Forcible Rape, supra,* 61 Va.L.Rev. at p. 1506 [resistance is inadvisable since it may provoke greater injury]; Amir, Patterns in Forcible Rape, *supra,* at pp. 164-165; *Consent Standard, supra,* 43 U.Chi.L.Rev. at pp. 626-627.)[17]

In a 1976 study of rape victims and offenders, the Queen's Bench Foundation found that over half of the sexual assault offenders studied reported becoming more violent in response to victim resistance. (*QBF, supra,* at p. 85.) Injury as reported by victims correlated with some form of resistance, including verbal stalling, struggling and slapping. (*Id.*, at p. 108.) Those victims who resisted during coitus suffered increased violence as the assailant forced compliance. (*Id.*, at p. 84.) Victim resistance, whether passive or active, tended to precede an increase or intensification of the assailant's violence. (*Id.*, at p. 85; accord Amir, Patterns in Forcible Rape, *supra,* at pp. 164-165, 169-171 [victim resistance in some instances serves to provoke more physical brutality and sexual humiliation].)

On the other hand, other findings indicate that resistance has a direct correlation with *deterring* sexual assault. (*QBF, supra,* at p. 105.) Of the 75 convicted rapists the Queen's Bench Foundation questioned, half believed that their sexual assaults could have been deterred by active victim resistance. (*Id.*, at p. 109.) Brownmiller argues that submissive behavior is *not* necessarily helpful to a rape victim and suggests that strong resistance on the part of women can thwart rape. (Brownmiller, *supra,* at pp. 357, 360-361.) She suggests it would be well for women to undergo systematic training in self-defense in order to fight back against their attackers. (*Id.*, at pp. 403-404.)

Reflecting the foregoing uncertainties about the advisability of resistance, the Queen's Bench Foundation concluded: "Overall, the research findings suggest that rape prevention is more possible through vigorous resistance[;]

---

[17]One author strongly discourages any type of resistance in sexual assault, including screaming, weapon use, self-defense and even feigned fainting. (Storaska, How to Say No to a Rapist and Survive (1975) pp. 30-49.)

however, resistance incurs greater risk of injury. When confronted with attack, each woman must make a choice which is highly personal and may be affected by situational factors beyond her control." (*QBF, supra,* at p. 109.) These conclusions are also contained in a pamphlet for distribution to the general public in which the reader is advised that physical resistance may increase the danger or may thwart the attack; the woman must therefore evaluate the threat she faces and decide how to react based on the kind of person she is. (Rape (Queen's Bench Foundation, undated pamp.); see also Storaska, How to Say No to a Rapist and Survive, *supra,* at p. 33 [in sexual assault, the woman must decide on a course of action which will give her the best chance of survival].)

In sum, it is not altogether clear what the absence of resistance indicates in relation to the issue of consent. Nor is it *necessarily* advisable for one who is assaulted to resist the attack. It is at least arguable that if it fails to deter, resistance may well increase the risk of bodily injury to the victim. This possibility, as well as the evolution in societal expectations as to the level of danger a woman should risk when faced with sexual assault, are reflected in the Legislature's elimination of the resistance requirement. In so amending section 261, subdivision (2), the Legislature has demonstrated its unwillingness to dictate a prescribed response to sexual assault. For the first time, the Legislature has assigned the decision as to whether a sexual assault should be resisted to the realm of personal choice.

The elimination of the resistance requirement is also consistent with the modern trend of removing evidentiary obstacles unique to the prosecution of sexual assault cases. For example, in enacting section 1112 in 1980, the Legislature barred psychiatric examinations of rape complainants which had been authorized in *Ballard* v. *Superior Court, supra,* 64 Cal.2d at pages 175-177. In recent years, the Legislature has also prohibited the instructional admonition that an "unchaste woman" is more likely to consent than her chaste counterpart (§§ 1127d & 1127e; see Use Note, CALJIC No. 10.06 (1974 rev.)); and has largely precluded the use of evidence of a complaining witness's sexual conduct to prove consent (Evid. Code, § 1103, subd. (b) et seq.; see *People* v. *Blackburn* (1976) 56 Cal.App.3d 685, 689-692 [128 Cal.Rptr. 864] [upholding constitutionality thereof]; *Unchaste Character, supra,* 54 So.Cal.L.Rev. at pp. 52-53 & 72-80).

This court has made similar strides. Over a decade ago, the use of CALJIC No. 10.22, embodying the deprecatory "Hale instruction,"[18] was

---

[18]Former CALJIC No. 10.22 read: "'A charge such as that made against the defendant in this case is one which is easily made and, once made, difficult to defend against, even if the person accused is innocent. [¶] Therefore, the law requires that you examine the

disapproved. (*People* v. *Rincon-Pineda, supra,* 14 Cal.3d at pp. 882-883.) That holding laid to juridical rest the notion that "those who claim to be victims of sexual offenses are presumptively entitled to less credence than those who testify as the alleged victims of other crimes." (*Id.,* at p. 877.)

Moreover, consistent with the principle of *equalizing* the position of rape complainants before the fact-finder, this court recently disallowed expert testimony on the issue of "rape trauma syndrome" for the purpose of proving nonconsent and as a means of bolstering the prosecuting witness's testimony. (*People* v. *Bledsoe* (1984) 36 Cal.3d 236, 248-251 [203 Cal.Rptr. 450, 681 P.2d 291]; *People* v. *Stanley* (1984) 36 Cal.3d 253 [203 Cal.Rptr. 461, 681 P.2d 302].)

By removing resistance as a prerequisite to a rape conviction, the Legislature has brought the law of rape into conformity with other crimes such as robbery, kidnapping and assault, which require force, fear, and nonconsent to convict. In these crimes, the law does not expect falsity from the complainant who alleges their commission and thus demand resistance as a corroboration and predicate to conviction. (See generally, *Consent Standard, supra,* 43 U.Chi.L.Rev. at pp. 637-638; *Rape and Rape Laws, supra,* 61 Cal.L.Rev. at pp. 938-939; Brownmiller, Against Our Will, Men, Women and Rape, *supra,* at pp. 384-385.) Nor does the law expect that in defending oneself or one's property from these crimes, a person must risk injury or death by displaying resistance in the face of attack. (*Ibid.*) The amendment of section 261, subdivision (2), acknowledges that previous expectational disparities, which singled out the credibility of rape complainants as suspect, have no place in a modern system of jurisprudence.

This court therefore concludes that the Legislature's purposes in amending section 261 were (1) to relieve the state of the need to establish resistance as a prerequisite to a rape conviction, and (2) to release rape complainants from the potentially dangerous burden of resisting an assailant in order to substantiate allegations of forcible rape. (Accord *People* v. *Salazar, supra,* 144 Cal.App.3d at p. 807.)

As noted, it is no longer proper to instruct the jury that it must find the complainant resisted before it may return a verdict of guilt. (*People* v. *Salazar, supra,* 144 Cal.App.3d at pp. 807-808; see CALJIC No. 10.00

---

testimony of the female person named in the information with caution.'" (*People* v. *Rincon-Pineda, supra,* 14 Cal.3d at p. 871.) The instruction was based on Sir Matthew Hale's well-worn 17th century admonition that the testimony of "sometimes . . . malicious and false" rape complainants must be cautiously scrutinized since rape "'is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, tho never so innocent.' [Citation.]" (*Id.,* at pp. 873, 874, 875.)

(1982 rev.) quoted *ante,* at fn. 12.) Nor may lack of resistance be employed by courts—like the Court of Appeal here—to support a finding of insufficient evidence of rape under section 261, subdivision (2).[19]

For these reasons, the Court of Appeal's reliance upon any absence of resistance by Marsha was improper.

### III.

The question remains whether proper application of amended section 261 to the instant facts compels reversal of appellant's convictions of rape by means of force or fear of unlawful bodily injury and false imprisonment.

The proper test to determine a claim of insufficient evidence in a criminal case is whether, on the entire record, a rational trier of fact could find appellant guilty beyond a reasonable doubt. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576-578 [162 Cal.Rptr. 431, 606 P.2d 738]; *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573, 91 S.Ct. 2781].) In making this determination, the appellate court "'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.] . . . '[O]ur task . . . is twofold. First, we must resolve the issue in the light of the *whole record* . . . . Second, we must judge whether the evidence of each of the essential elements . . . is *substantial* . . . .'" (*People* v. *Johnson, supra,* 26 Cal.3d at pp. 576-577, italics in original.)

Although the appellate court must ensure the evidence is reasonable in nature, credible, and of solid value (*People* v. *Johnson, supra,* 26 Cal.3d at p. 576), it must be ever cognizant that "'it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends . . . .'" (*People* v. *Thornton* (1974) 11 Cal.3d 738, 754 [114 Cal.Rptr. 467, 523 P.2d 267], disapproved on other grounds, *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].) Thus, if the verdict is supported by substantial evidence, this court must accord due deference to the trier of fact and not substitute its evaluation of a witness's credibility for that of

---

[19]The statutory change does not mean that when resistance does exist, it is irrelevant to nonconsent. Absence of resistance may also continue to be probative of whether the accused honestly and reasonably believed he was engaging in consensual sex. (See *People* v. *Mayberry* (1975) 15 Cal.3d 143, 155 [125 Cal.Rptr. 745, 542 P.2d 1337].)

the fact-finder. (*People* v. *Samuel* (1981) 29 Cal.3d 489, 505 [174 Cal.Rptr. 684, 629 P.2d 485]; *People* v. *Kerr* (1951) 37 Cal.2d 11, 15 [229 P.2d 777].)

■ Under prior law, forcible rape required that the accused employ that degree of force necessary under the circumstances to overcome the victim's resistance. (*People* v. *Wheeler* (1977) 71 Cal.App.3d 902, 907 [139 Cal.Rptr. 737].) Although resistance is no longer the touchstone of the element of force, the reviewing court still looks to the circumstances of the case, including the presence of verbal or nonverbal threats, or the kind of force that might reasonably induce fear in the mind of the victim, to ascertain sufficiency of the evidence of a conviction under section 261, subdivision (2). (See *People* v. *Bermudez* (1984) 157 Cal.App.3d 619, 624 [203 Cal.Rptr. 728]; *People* v. *Hunt, supra,* 72 Cal.App.3d at p. 194; cf. *People* v. *Bradbury* (1907) 151 Cal. 675, 677 [91 P. 497].) Additionally, the complainant's conduct must be measured against the degree of force manifested or in light of whether her fears were genuine and reasonably grounded. (*Bermudez, supra,* 157 Cal.App.3d at pp. 624-625; see also *People* v. *La Salle* (1980) 103 Cal.App.3d 139, 149 [162 Cal.Rptr. 816]; *Hunt, supra,* 72 Cal.App.3d at pp. 194, 198; *People* v. *Harris* (1951) 108 Cal.App.2d 84, 89 [238 P.2d 158]; see also *State* v. *Rusk* (1981) 289 Md. 230 [424 A.2d 720, 726-727] and cases cited therein at fn. 3.)[20] In the words of one commentator, the trier of fact "should be permitted to measure consent by weighing both the acts of the alleged attacker and the response of the alleged victim, rather than being required to focus on one or the other." (*Consent Standard, supra,* U.Chi.L.Rev. at p. 627.)

■ Marsha's testimony constitutes substantial evidence of rape by means of force or fear of immediate and unlawful bodily injury under the provisions of section 261, subdivision (2). From the moment she arrived at appellant's house, she communicated to him that she did not want to stay and intended to leave after purchasing marijuana. She initially refused appellant's suggestion that they go inside, but ultimately agreed so that she could obtain the marijuana. Once inside, she repeated her desire to proceed with the drug transaction so she could leave. She rebuffed the first round of appellant's physical advances by pushing him away and telling him to stop. When appellant disregarded this rebuff and continued his advances, Marsha left the room and went to the front gate. At this point, appellant's demeanor changed markedly. He cursed and berated Marsha for leaving, apparently in an effort to intimidate her.

---

[20]In some circumstances, even a complainant's unreasonable fear of immediate and unlawful bodily injury may suffice to sustain a conviction under section 261, subdivision (2), if the accused knowingly takes advantage of that fear in order to accomplish sexual intercourse. (See *People* v. *St. Andrew* (1980) 101 Cal.App.3d 450, 466 [161 Cal.Rptr. 634]; *People* v. *Bermudez, supra,* 157 Cal.App.3d 619, 625.)

At the front gate, Marsha repeatedly requested that appellant "let me leave," a plea which fell on deaf ears. Significantly, on at least one such occasion, appellant "reared back"—a gesture which made Marsha believe he was going to hit her. Appellant created the impression, even if it were untrue, that the outside gate was locked and that Marsha would not be able to open it. He reinforced this impression by telling her he would *let* her leave after he returned to the room for his shoes.

Back in the room, appellant shouted at Marsha, cursing the fact she had caused the door to slam. He interrupted his angry, verbal onslaught only to stop all activity and look at Marsha in a "funny" manner. He threatened her by displaying his muscles, grabbing her by the collar, and claiming he could pick her up with one hand and throw her out.

Most importantly, he ominously informed her he could make her do "anything he wanted" and that she was about to see the "bad side" of him. These statements were made in conjunction with his boasting of having had other women perform sex acts upon him and with Marsha's statement to him that she could not fight him. Appellant's response of pressing the door closed when he saw Marsha's movement toward it also suggested coercion. Finally, when Marsha initially refused to remove her clothes, appellant warned her—both physically and verbally—that her refusal "was going to make him angry."

In light of the totality of these circumstances, the jury, having observed the witnesses and their demeanor, could reasonably have concluded that Marsha's fear of physical violence from appellant if she did not submit to sexual intercourse was genuine and reasonable. Under these facts, a reasonable juror could have found that Marsha's subsequent compliance with appellant's urgent insistence on coitus was induced either by force, fear, or both, and, in any case, fell short of a consensual act. (Cf. *People* v. *Bermudez, supra,* 157 Cal.App.3d at pp. 624-625.)

Additionally, Marsha several times communicated her unwillingness to stay and have sexual intercourse with appellant. Appellant should have realized that his threatening conduct, combined with Marsha's rejection of his sexual advances and repeated requests to leave, created a situation where he was able to overcome rather than respect her will. That appellant may have deluded himself into believing her eventual submission represented a consensual act could have been rejected by a rational trier of fact as an unreasonable response to Marsha's conduct. Therefore, the jury's rejection of appellant's defense that he reasonably believed she consented was proper given the totality of these circumstances. (See *People* v. *Mayberry, supra,* 15 Cal.3d at pp. 149-150.)

▉ Appellant contended in the Court of Appeal that Marsha's testimony was inherently improbable because (1) she returned to appellant's room after the argument at the front gate; (2) she returned appellant's kisses during the sex act; and (3) she fell asleep after having intercourse.

▉ "'Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]' . . . ." (*People* v. *Thornton, supra,* 11 Cal.3d at p. 754.)

▉ Applying these principles, it cannot be said that Marsha's testimony was inherently improbable. She testified she returned to the room because she felt she could not leave without appellant's aid. The jury may well have concluded her return was a reasonable response, especially since it was cold outside and at that point the situation had not so grossly deteriorated.

Marsha also explained that she pretended to be a willing partner and to invite appellant to her house in an attempt to extricate herself from the situation. She testified that she engaged in sexual intercourse to avoid physical violence. A reasonable juror could have concluded that her subsequent act of exchanging kisses was part of a similar effort to avoid physical violence by simulating reciprocation. (See *People* v. *Norrington, supra,* 55 Cal.App. at p. 111.) Marsha was not required to display either active or passive resistance in order to save her testimony from inherent improbability, or to "develop corroborative evidence." (*People* v. *Salazar, supra,* 144 Cal.App.3d at p. 807.)

Finally, the fact that Marsha fell asleep after sexual intercourse was of little consequence. Her failure to stay alert and awake was at least susceptible of the conclusion that she was physically exhausted after having spent almost two hours attempting to extricate herself from an escalating and potentially dangerous situation. Moreover, the jury could have reasonably concluded that in Marsha's judgment, the danger of physical violence had passed with the violation of her physical integrity and that, therefore, she could temporarily relax. Although the record is not clear, it appears that any slumber

to which she succumbed lasted but a brief period of time—perhaps only minutes.

When she awoke, she renewed her efforts to leave by cajoling appellant into letting her out of the gate. Thereafter, she called Kaiser Hospital and reported to the sexual trauma center for an examination. At most, her falling asleep was an unusual circumstance and does not render the entirety of her testimony inherently improbable. (*People* v. *Mayberry, supra*, 15 Cal.3d 143, 150.)

Under these circumstances, this court holds that the evidence was sufficient to sustain appellant's conviction of rape. The false imprisonment conviction must also be affirmed, as its commission was attendant to the rape.

## IV.

The Court of Appeal's reliance on former section 261, subdivision 2, was misplaced since appellant's conduct was governed by section 261, subdivision (2), as amended in 1980. The 1980 amendment was clearly intended to eliminate the requirement that a rape complainant display resistance to an assailant in order to substantiate her allegation of rape. Therefore, any lack of resistance on the part of the complainant in this case was not a proper factor in determining whether the evidence was sufficient to support appellant's rape conviction. Sufficient evidence existed to support the convictions for rape and false imprisonment under the law.

The decision of the Court of Appeal is reversed and that court is directed to enter its order affirming the judgment of conviction.

Mosk, J., Broussard, J., Reynoso, J., Grodin, J., Lucas, J., and Panelli, J., concurred.

Appellant's petition for a rehearing was denied September 18, 1986, and the opinion was modified to read as printed above.