[No. B041408. Second Dist., Div. Six. July 3, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES PHILIP SLATON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication. The portion to be published follows.

COUNSEL

Charles Philip Slaton, in pro. per, and Glen Durfee, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Donald E. de Nicola and Carol Frederick Jorstad, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**GILBERT, J.**—Defendant Charles Philip Slaton appeals his judgment of conviction of grand theft and attempted grand theft. We affirm and hold that he had no reasonable expectation of privacy in loan documents submitted to institutional lenders.

## FACTS

Slaton was convicted of 11 counts of grand theft and 2 counts of attempted grand theft arising from the defrauding of homeowners who sold their homes to him and lending institutions from which he sought refinancing. Evidence at trial and reasonable inferences therefrom, viewed most favorably to the judgment (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110]), established:

Slaton was a licensed real estate broker doing business as Pacifica Shores Realty. He employed codefendant Kay Austin as a real estate salesperson. Another real estate salesperson testified that Austin worked closely with Slaton under his specific direction: "He would tell her exactly what to say on a transaction and [it would] have to be verbatim. I've seen him lose his temper at her because she didn't word it correctly . . . . [S]he was to know exactly what he was telling her and . . . do it right." Slaton's bookkeeper also testified that she witnessed Austin and Slaton discussing purchase offers she made on his behalf.

Austin approached homeowners whose homes had been listed for sale but had not sold, stating that she represented Slaton as a buyer. The purchase agreement between Slaton and the sellers provided for a partial payment to the sellers on or shortly after close of escrow and a promissory note from Slaton to be paid months or years later. Although the escrow instructions specified that the deed of trust securing the promissory note was not to be recorded immediately, the sellers testified they were not aware that the deed of trust was "silent" or "hidden." Prior to the recording of the deeds of trust, Slaton refinanced the properties with institutional lenders and obtained a cash payoff for himself. Homeowners who sold their homes to Slaton under these circumstances included the Smiths, the Kramers, the Insalatas, and the Gyrions.

Slaton sought refinancing upon the properties with falsely authenticated financial statements, false verifications of payments upon other mortgages, and false rental agreements. He did not inform the institutional lenders of the "hidden" or "silent" unrecorded trust deeds. Underwriters for the institutional lenders testified that had they known of the unrecorded trust deeds, they would not have recommended loan approval because the loans would exceed their loan-to-value guidelines.

Slaton submitted financial statements and letters to the institutional lenders and the Smiths on stationery of Walker, Liponi & Company, certified public accountants. Although this accounting firm prepared tax returns and financial statements for Slaton, it did not prepare these particular

statements or letters. The financial data was not set forth in the method used by Walker, Liponi & Company, "Liponi" was misspelled, and the signature was not Walker's. One letter referred to a $17,900 trust account that did not exist.

Duane and Betty Smith sold their Oxnard home to Slaton for $132,500 in 1983. They accepted a promissory note secured by a trust deed for $59,652 of the purchase price. The escrow instructions required the trust deed securing the $59,652 note to be recorded 120 days after close of escrow. In the interim, Slaton refinanced the property with National Pacific Mortgage Company without disclosing the existence of this unrecorded trust deed. Slaton then defaulted upon the $59,652 promissory note and eventually, the refinance loan. The Smiths did not foreclose upon the property because it was encumbered by the senior refinance lien.

Slaton submitted a residential rental agreement to the refinance lender purportedly bearing Mr. Smith's signature and promising to pay $1,100 monthly rent. The Smiths did not agree to pay $1,100 monthly rent, however, and Mr. Smith's name was misspelled and the signature was not his.

In 1983 Gerda and Cornelis Kramer unsuccessfully sought to sell their Oxnard home when Austin approached them stating that she represented Slaton. The Kramers agreed to sell their home to him for $116,900 and to accept a promissory note for $21,956 in partial payment. This note was to be paid monthly for two years. The escrow instructions required the trust deed securing this note to remain unrecorded. Meanwhile, Slaton refinanced the property with Glendale Federal Savings and Loan and did not disclose the existence of this unrecorded trust deed. Mrs. Kramer testified that she would not have sold her home to Slaton if she knew a refinance lien would be senior to the trust deed securing her $21,956 note.

The Kramers remained in their home for several weeks after its sale and paid Slaton the amount of their previous mortgage payment as rent. A rental agreement purportedly bearing the Kramers' signatures that Slaton submitted to a refinance lender was not one they agreed to or signed, however.

Austin approached Italo and Mary Insalata in 1982 and stated that Slaton wished to purchase their home for $139,000. The Insalatas accepted and met Slaton a month later when he walked through the house. The purchase agreement required the Insalatas to accept a promissory note for $75,900 to be paid in one year as partial payment of the purchase price. Austin assured the Insalatas that the deed of trust securing the $75,900 note

would "gain[] first position" when Slaton paid another $68,000 promissory note to the Insalatas 120 days from close of escrow.

The Insalatas received the $68,000 payment but no payments on the $75,900 promissory note. Prior to the recordation of the trust deed securing the note, Slaton refinanced the property with Investors Mortgage Service Company.

The Insalatas rented the house from Slaton at a monthly rental of $550 per month. They did not sign an $800 monthly residential rent agreement that purported to bear their signatures.

In December 1983 Frank and Janet Gyrion sold their home to Slaton for $115,000. They agreed to accept a five-year promissory note for $33,376.95 as partial payment of the purchase price. The escrow instructions specified that the deed of trust securing this note would be recorded when another $26,000 promissory note from Slaton to the Gyrions was paid. Prior to recordation of the trust deed securing the $33,376.95 note, Slaton refinanced the property with Barclays Bank of California. Mrs. Gyrion testified she would not have sold her home to Slaton if she knew that a refinance lien would be senior to the lien securing the $33,376.95 note. The Gyrions received no payments upon the $33,376.95 note and brought a civil action against Slaton. In settlement of that lawsuit, Slaton quitclaimed the property to them and they assumed the refinance loan from Barclays Bank.

Slaton attempted to or did refinance these and other properties with National Pacific Mortgage Company, Lincoln Savings and Loan Association, Glendale Federal Savings and Loan Association, Barclays Bank of California and Investors Mortgage Service Company (five counts.) To National Pacific Mortgage Company, Lincoln Savings and Loan Association and Investors Mortgage Service Company, he submitted false rental agreements. To Lincoln Savings and Loan Association, Glendale Federal Savings and Loan Association, Barclays Bank of California and Investors Mortgage Service Company, he gave falsely authenticated financial statements and letters. These documents purported to be on the stationery of his accounting firm and signed by partner David Walker. To National Pacific Mortgage Company, Lincoln Savings and Loan Association and Investors Mortgage Service Company, he sent mortgage payment histories from "Tri-Counties Mortgage," purportedly a mortgage servicing company. The address of Tri-Counties Mortgage was Slaton's post office box. He added this name to his box in 1983. These credit histories were signed by "Mary Kathleen Hill," an alias of Kay Austin.

No lender was informed of an unrecorded trust deed securing part of the purchase price. An underwriter or loan officer for each lender testified that

the refinance loan would not have been approved if the existence of the unrecorded trust deed was known.

Slaton presented evidence in his defense that he met his financial obligations timely until his wife divorced him and took the family's cash and liquid assets. His bookkeeper testified concerning his financial habits and an attorney testified concerning Slaton's divorce and marital property contest.

The jury convicted Slaton of all counts, and the trial judge sentenced him to a total term of six years and eight months. On appeal he contends, among other things, the financial documents he submitted to the lenders were seized unconstitutionally.

. . . . . . . . . . . . . . . . . . . .*

## DISCUSSION

■ Slaton argues he had a Fourth Amendment privacy interest in the documents he submitted to the institutional lenders to obtain refinance loans. These documents include loan applications, real estate purchase and sale contracts, escrow instructions, preliminary title reports, lists of properties owned, and rental agreements. The seizure of these documents, he adds, was warrantless and therefore, unreasonable. He attempts to distinguish *United States* v. *Miller* (1976) 425 U.S. 435 [48 L.Ed.2d 71, 96 S.Ct. 1619], by arguing that *Miller*, authorizing the warrantless seizure of bank records, pertains only to negotiable instruments. Slaton argues that he had a business relationship with the bank, and therefore his status is more exalted than that of a mere depositor.

*United States* v. *Miller, supra*, 425 U.S. 435, permitted the warrantless seizure of deposit slips, checks and financial statements because the bank customer had no legitimate expectation of privacy in these papers. (*Id*., at p. 442 [48 L.Ed.2d at pp. 78-79].) *Miller* declared that the depositor assumes a risk that information he reveals to another will be given to the government: "This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed. [Citations.]" (*Id*., at p. 443 [48 L.Ed.2d at p. 79].)

---

*See footnote, *ante*, page 1041.

This reasoning applies to negotiable instruments submitted by a bank customer as well as to loan applications and supporting financial data offered by a potential borrower. A potential borrower must assume the risk that the information he offers a lender, in support of a loan application, will be conveyed by the lender to the government. This is especially true where, as here, the borrower sought to defraud the lender. A defendant cannot claim a reasonable expectation of privacy in documents he offers to defraud his victim. Thus, the government's seizure of the lenders' loan files here, although warrantless, was proper.

II-IV*

. . . . . . . . . . . . . . . . . . . . .

Accordingly, the judgment is affirmed.

Stone (S. J.), P. J., and Abbe, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 17, 1990.

---

*See footnote, *ante,* page 1041.