Filed 6/13/13  P. v. Torres CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046380 |
| v. | (Super. Ct. No. 08HF0862) |
| RAUL TORRES, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, David A. Hoffer, Judge.  Affirmed as modified.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, James D. Dutton and Stephanie H. Chow, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Raul Torres challenges his convictions for felony child endangerment and felony vandalism. He also says the court violated the ex post facto laws in affixing the amount of the restitution fines imposed against him. Substantial evidence supports the convictions for felony child endangerment and felony vandalism. However, we agree that the amounts of the restitution fines should be reduced from $240 to $200 each because the trial court intended to impose the minimum restitution fines and it imposed the minimum restitution fines in effect at the time of sentencing rather than the minimum restitution fines in effect at the time the crimes were committed. We affirm the judgment but direct that the abstract of judgment be corrected to set the restitution fines at $200 each.

I

FACTS

A. *Background:*

Defendant and A. were married in 2001. Although the two of them had no children together, defendant helped raise A.'s youngest son from the time he was an infant. Defendant and A. were separated from time to time and A. had threatened to file for divorce before the incident in question.

A. was living in an apartment with her youngest son, then eight years old (the boy), her daughter, and her sister, K. A. was at home with K. and the boy when defendant, who was drunk, arrived in the early morning hours of April 5, 2008. A. did not want defendant to come in, but K. opened the door. A. was hiding under the blanket in bed because she did not want defendant to see her. The boy was asleep in bed in the same room.

A. told the police that defendant came in, pushed K. aside, and said, "'Where is this bitch? I'm going to kill her.'" She also told them she was on the bed with the boy right next to her, screaming, while defendant was swinging a knife at her, putting it to her neck, and saying he was going to kill her.

2

K. got defendant out of the bedroom. She told the police that after defendant left the bedroom, he dropped the knife and started throwing things at the 37-inch flat screen television, which he broke. Defendant then left the apartment and broke the bedroom window from the outside, smashing it with a baseball bat. Broken glass landed on the bed, which was under the window.

K. and a neighbor each called 911. The police came and A. told them she was afraid that defendant, a gang member, would retaliate against her for talking to the police.

*B. Judgment:*

The jury found defendant guilty of aggravated assault (Pen. Code, § 245, subd. (a)(1)), felony child abuse or endangerment (Pen. Code, § 273a, subd. (a)), two counts of misdemeanor vandalism (Pen. Code, § 594, subds. (a), (b)(2)(A)), felony vandalism (Pen. Code, § 594, subds. (a), (b)(1)), making criminal threats (Pen. Code, § 422) and stalking (Pen. Code, § 646.9, subd. (a)). It found true that the amount of damage caused by the felony vandalism of a 37-inch flat screen television was $400 or more and that defendant used a dangerous or deadly weapon at the time he made the criminal threats. He was sentenced to a total of 21 years in prison. He was ordered to pay a restitution fine in the amount of $240 (Pen. Code, § 1202.4, subd. (b)) and a parole revocation restitution fine in the same amount (Pen. Code, § 1202.45).

II

DISCUSSION

*A. Felony Child Endangerment:*

*(1) Penal Code section 273a—*

Penal Code section 273a, subdivision (a) provides: "Any person who, *under circumstances or conditions likely to produce great bodily harm or death*, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or

3

mental suffering . . . shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years." (Pen. Code, § 273a, subd. (a), italics added.)

In contrast, Penal Code section 273a, subdivision (b) provides: "Any person who, *under circumstances or conditions other than those likely to produce great bodily harm or death*, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering . . . is guilty of a misdemeanor." (Pen. Code, § 273a, subd. (b), italics added.) In other words, the same conduct is either a felony or a misdemeanor depending upon whether the circumstances or conditions made it *likely* that the child would suffer great bodily harm or death. (*People v. Wilson* (2006) 138 Cal.App.4th 1197, 1201.)

Defendant claims he should not have been convicted of a felony because there was insufficient evidence to show that his actions made it likely that the boy would suffer great bodily harm or death. He says this court should reduce his conviction to a misdemeanor.

In *People v. Sargent* (1999) 19 Cal.4th 1206, the Supreme Court, without analyzing the language of Penal Code section 273a, noted that the felony provision was "'intended to protect a child from an abusive situation in which the probability of serious injury [was] great.' [Citation.]" (*Id.* at p. 1216.) Picking up on the court's wording, defendant says the felony conviction was improper because the evidence did not show that his conduct "posed a 'great' risk of serious bodily injury or death to" the boy.

However, the court in *People v. Wilson*, *supra*, 138 Cal.App.4th 1197 concluded that the comment of the Supreme Court in *People v. Sargent*, *supra*, 19 Cal.4th 1206 to the effect that a felony occurs when "'the probability of serious injury is great[,]'" was dictum. (*People v. Wilson*, *supra*, 138 Cal.App.4th at pp. 1203-1204.) We agree. In construing the statute, we to look its language, which addresses whether the action was taken "under circumstances or conditions *likely* to produce great bodily harm

4

or death." (Pen. Code, § 273a, subd. (a), italics added.) As the court in *People v. Wilson*, *supra*, 138 Cal.App.4th 1197 observed, "the definition of 'likely' in the context of section 273a is not that the death or serious injury is probable or more likely than not." (*Id.* at p. 1204.) "'[L]ikely' as used in section 273a means a substantial danger, i.e., a serious and well-founded risk, of great bodily harm or death." (*Ibid.*)

In any event, it is for the trier of fact to "determine whether the infliction of the unjustifiable physical pain or mental suffering on a child was under circumstances or conditions likely to produce great bodily harm or death." (*People v. Sargent*, *supra*, 19 Cal.4th at p. 1224.) "In determining whether the evidence is sufficient to support the verdict, we review the entire record viewing the evidence in the light most favorable to the judgment and presuming in support of the verdict the existence of every fact the jury could reasonably deduce from the evidence. The issue is whether the record so viewed discloses evidence that is reasonable, credible and of solid value such that a rational trier of fact could find the elements of the crime beyond a reasonable doubt. [Citation.]" (*People v. Wilson*, *supra*, 138 Cal.App.4th at p. 1201.)

For reasons we shall show, we conclude that substantial evidence supports both a finding that defendant's conduct caused a substantial danger, that is, a serious and well-founded risk, of great bodily harm or death to the boy (*People v. Wilson*, *supra*, 138 Cal.App.4th at p. 1204) and that his conduct posed a great risk of serious bodily injury or death to the boy (*People v. Sargent*, *supra*, 19 Cal.4th at p. 1216). Under either test, the felony conviction was proper.

*(2) Evidence—*

*(a) use of a knife*

Purportedly, defendant willfully undertook acts—confronting A. with a knife in the presence of the boy and smashing the bedroom window—that caused mental suffering to the boy, under circumstances or conditions likely to produce great bodily

harm or death. Defendant argues there is no substantial evidence to show that he used a knife so as to place the boy at great risk of suffering bodily harm or death.

*(i) A.'s statements and testimony*

A. admits that she told the police the boy was right next to her on the bed when defendant started swinging a knife at her, putting it to her neck, and saying he was going to kill her. She also admits she told them that when defendant put the knife to her neck, the boy was screaming, "'Daddy, don't kill my mom.'" At the time of trial, however, A. said that while it was true the boy was next to her in the bed during the altercation, she had lied about defendant's using a knife and making threats. She said she had lied in order to get defendant arrested. At the time of trial, A. acknowledged that the boy had led the police to a knife under the kitchen sink, the knife did not belong to either her or the boy, and it was not under the sink before defendant came to the apartment.

*(ii) police officer testimony*

Police Officer Alberto Lopez responded to the scene around 1:25 a.m. on April 5, 2008. Officer Lopez testified that A. and the boy each appeared to be afraid. According to Officer Lopez, A. said she felt threatened and that she feared defendant or his gang would retaliate against her because she had spoken to the police. Officer Lopez testified that A. told him defendant had been yelling at her, swinging a knife at her, lunging at her, and threatening to kill her. Officer Lopez said that according to A., the boy had been crying, yelling to call the police, and telling her to get away.

Officer Lopez testified that A. told him defendant had left the knife on the coffee table. The knife wasn't there when Officer Lopez looked for it, but he later found it under the kitchen sink.

Police Officer Julian Trevino was assigned to investigate the April 5, 2008 incident. His first contact with A. was a few days afterward. Officer Trevino said A. "was very emotional, crying at times." A. reported to Trevino that defendant was angry with her and threatening, while holding a knife, and said he was going to kill her.

6

On April 27, 2008, A. called the police in connection with a stalking incident at a miniature golf course. Police Officer Jared Shurley testified that when he interviewed A., she mentioned the April 5, 2008 incident, and told him that defendant had held a knife to her throat and said he was going to kill her.

*(iii) K.'s statements and testimony*

K. admitted having told the police that defendant had lunged at A. with a knife in his hand going towards A.'s face and that when he left the bedroom, he dropped the knife and grabbed some stuff to start throwing at the television. The 911 recording of K.'s call also reflected that she told the dispatcher defendant had pulled a knife. However, K. testified at trial that what she said had about the knife was a lie told at the request of her sister. She also testified that defendant did not threaten to kill A. Rather, she testified that defendant was drunk and pointed his finger about an inch away from A.'s face, but without a knife.

*(b) evidence regarding proximity of the boy*

Defendant also points out inconsistencies in the evidence concerning the exact location of the boy during the altercation in the bedroom and says there is no evidence concerning the boy's precise whereabouts when the window was shattered. Given this, he says there is no substantial evidence to show that either the altercation or the breaking of the glass posed a risk of great bodily harm or death to the boy.

A. testified that there were two beds in her bedroom—a big bed for herself and a "SpongeBob" bed in the corner for the boy. She further testified that she was hiding under the blanket in the big bed when defendant entered the room and that the boy was asleep in the big bed.

However, Officer Lopez testified that A. had said the boy was in his bed right next to hers, at the time of the altercation. According to Officer Lopez, A. had said defendant was at the edge of the bed swinging at her, lunging at her, and saying he was going to kill her. Officer Lopez indicated that defendant would have been situated

7

between the two beds and that there was about a two-foot space between them.  He also testified that, according to A., when defendant shattered the window, she was still on the bed.

At trial, K. testified that A. had gotten into bed with the boy and pretended to be asleep.  K. further testified that the boy was still in the bedroom when defendant broke the television, located in the living room.

*(iv)  the neighbor's testimony*

The neighbor, who lived in the same apartment building as A., heard a woman screaming a type of scream that was not from "normal arguing."  He said, "[i]t was actual terror like" and he heard a lot of crashing and stuff.  After the police left, the neighbor went downstairs and spoke to the woman, who was extremely shaken up and was crying.  The neighbor also saw a boy who "was extremely shaking [*sic*]," with "extremely fearful" and "terrified" eyes.

*(c) analysis*

Clearly, there was conflicting testimony as to whether defendant used a knife when he confronted A. and whether he threatened to kill her.  A. and K. both told the police that defendant had used a knife and A. also told them that defendant had threatened to kill her.  The police found a knife under the kitchen sink.  At trial, A. and K. both recanted significant portions of their stories.  While A. explained that she had said what she did merely because she wanted defendant to get arrested, she had also told the police that she was afraid to speak to them because defendant was a gang member and she feared gang retaliation.  Given the information provided to the police, the finding of a knife at the scene, the descriptions by Officer Lopez and the neighbor of the fearfulness of both A. and the boy, and the fact that A. had said she feared gang retaliation, there was substantial evidence from which a reasonable jury could conclude that what A. and K. told the police immediately after the incident was true—that defendant had threatened

8

A.'s life with a knife in the immediate presence of the boy—and that A. and K. later changed their stories out of fear of gang retaliation.

Furthermore, the testimony of A. and K. about the location of the boy provides substantial evidence to show that the boy was in the same bed as A. when defendant threatened to kill her and lunged at her with a knife. Although Officer Lopez testified that A. had told him the boy was in his own bed, even if that were the case, a reasonable jury could still conclude that the boy was in harm's way. Officer Lopez said there was only about a two-foot space in between the two beds and that defendant would have been standing between those two beds, when lunging at A. with the knife. To put a frantic, terrified child in fear of his mother's life in such close proximity of a swinging knife surely is to put that child in harm's way. There is no telling what he might have done, whether he might have run and potentially collided with a swinging knife, or whether he even might have tried to block the knife. To say that there was no risk of great bodily harm or death is sheer folly.

Defendant is correct that we do not have testimony concerning the exact whereabouts of the boy when the window was shattered. We have evidence that he was in the same bed as A. during the altercation with defendant and that A. remained in that bed, situated below the window, when defendant shattered it. We also have evidence that the boy was still in the bedroom when defendant broke the television. We have no evidence that the boy left the bedroom before defendant broke the window. The jury may have doubted that a small and frightened child would have left his mother's side after such a terrifying episode. In the absence of any contrary information, it may reasonably have deduced that the boy remained next to his mother when defendant shattered the window above the bed, putting the boy at risk of injury from flying shards of glass.

"'On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]'" (*People v. Ochoa* (1993) 6

9

Cal.4th 1199, 1206.) Here, the evidence was sufficient to support a finding that defendant willfully placed the boy at risk of great bodily harm or death when he lunged at A. swinging a knife, in the immediate proximity of the boy, and when he shattered a glass window above the bed in which the boy and his mother took refuge.

*B. Felony Vandalism:*

Vandalism is a felony when the property damage is $400 or more and a misdemeanor when the property damage is less than $400. (Pen. Code, § 594, subd. (b); *Sangha v. LaBarbera* (2006) 146 Cal.App.4th 79, 87, fn. 6.) Misdemeanor vandalism is a lesser included offense of felony vandalism. (*Sangha v. LaBarbera*, *supra*, 146 Cal.App.4th at p. 87, fn. 6.) Defendant says there is no substantial evidence to show that he caused at least $400 in damage to the television. Consequently, he says this court must reduce his conviction to misdemeanor vandalism.

*(1) Evidence—*

Defendant emphasizes that the only information on the type of damage to the television came from A., who stated that the screen was broken. He points out that the screen is not the only component to a television and that there was no testimony regarding whether the television could have been fixed or how much it would have cost to fix it.

He also cites the testimony of Officer Trevino as showing that the television itself was worth only several hundred dollars. That characterization of his testimony is misleading, however. At trial, Officer Trevino was asked how much A. had said she paid for the television. Officer Trevino replied, "I believe it's several hundred dollars she said." Officer Trevino was then asked whether it would refresh his recollection to look at a copy of the transcript of recordings of his conversations with A. The officer replied affirmatively. Having reviewed the transcript, the officer stated, "She said she paid $1,500 for a TV."

10

Defendant also notes that there were inconsistencies in A.'s statements. A. told Officer Lopez that she had paid $1,300 for the television and she told an investigator that defendant had given her $1,000 to replace the television, but at trial A. testified that she had lied on both points. Ultimately, A. conceded at trial that defendant had gotten her a replacement television for $1,000 on a payment plan, and clarified that he had not handed her $1,000.

Although A.'s testimony was contradictory, her testimony was not the only evidence before the court. In addition, the jury had for its consideration two photographs of the broken television that were entered into evidence. The jurors thus had an opportunity to see for themselves the general size and character of the television and the kind of damage inflicted upon it.

There was ample evidence to support a finding that at least $400 in damage was inflicted upon a 37-inch flat screen television. "'"Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]" . . . .' [Citation.]" (*People v. Barnes* (1986) 42 Cal.3d 284, 306.)

*(2) Relevance—*

Defendant says all the evidence concerning the purchase price of the television was irrelevant, particularly considering that there was no information on the age of the television or its condition. He also says that the evidence about the cost of a replacement television was irrelevant because there was no information on whether the replacement television was comparable to the one that had been damaged. Given this, he contends the determination that there was at least $400 in damage to the television was based on pure speculation, and a conviction cannot be supported by mere speculation. (*People v. Marshall* (1997) 15 Cal.4th 1, 35 [mere speculation insufficient].)

11

Defendant maintains that the only thing that was relevant was the fair market value of the property that was destroyed. He cites cases to the effect that in determining whether a defendant has committed grand theft (Pen. Code, § 484) or whether a sentencing enhancement (Pen. Code, § 12022.6) should apply with respect to the theft of property exceeding $100,000 in value, the key is the fair market value of the stolen property. (See *People v. Pena* (1977) 68 Cal.App.3d 100; *People v. Swanson* (1983) 142 Cal.App.3d 104.) However, defendant has not cited a case showing that only the fair market value of vandalized property is relevant when assessing the amount of damage to it. If the side of a house were marred with graffiti, it is unlikely that we would affix the amount of damage at the fair market value of the house, and therefore unlikely that we would need testimony about its fair market value.

An owner of property is competent to testify as to its value. (*Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 921; cf. *People v. Prosser* (2007) 157 Cal.App.4th 682, 684.) True, A. did not testify as to the value of the television at the time it was damaged and did not opine as to whether the television was repairable, and if so, the cost of repair. However, she did provide information on the nature of the television—that it had a 37-inch flat screen, the original cost of the television, and the price of the television she accepted in replacement. She was competent to testify as to these matters and the weight to be given to A.'s testimony was for the jury as the trier of fact. (*Schroeder v. Auto Driveaway Co.*, *supra*, 11 Cal.3d at p. 921.) Furthermore, the jurors had the photographs of the television to aid their determination as to the amount of damage sustained. There has been no suggestion that the value of a 37-inch flat screen television, or the cost of a damaged screen, is so beyond the common experience of the average juror that expert testimony should have been provided on the point. (See Evid. Code, § 801.) There is substantial evidence to support the finding that the damage to the television was at least $400, so as to support a felony vandalism conviction.

*C. Restitution Fines:*

Effective January 1, 2012, the minimum restitution fine, pursuant to Penal Code section 1202.4, subdivision (b)(1), was increased from $200 to $240 for a felony conviction. (Stats. 2011, ch. 358, § 1.) Although defendant committed his crimes in 2008, he was sentenced in 2012. The court imposed a $240 restitution fine (Pen. Code, § 1202.4, subd. (b)) and a parole revocation restitution fine in an equal amount (Pen. Code, § 1202.45).

Defendant asserts that it was clear the court intended to impose the minimum restitution fine. Indeed, the court stated from the bench: "The court is also going to impose the restitution fine. Maybe counsel could help me with the amount of that restitution fine." Counsel for the People responded, "I believe it's now $240, isn't it?" Defendant's counsel stated, "I would submit." The court then stated, "I think it's gone up to $240, and I'll also impose the parole revocation restitution fine in the same amount, but that will be stayed pending any future violation of parole."

Defendant argues that because the court imposed the $240 minimum restitution fine in effect as of January 1, 2012 instead of the $200 minimum restitution fine in effect in 2008, the court violated the ex post facto clauses of the federal and the state Constitutions. As the Supreme Court has observed, "It is well established that the imposition of restitution fines constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause and other constitutional provisions. [Citations.]" (*People v. Souza* (2012) 54 Cal.4th 90, 143.)

The People, however, say the court had the power to impose a $240 restitution fine (inasmuch as, even under the old statute, $200 was the minimum, but not the maximum). At the same time, they concede the record indicates that the court's intent was to impose a fine in the minimum statutory amount, which would have been $200 for a felony committed in 2008. The People, then, say this court has the power to correct the apparent error. (See *People v. Mitchell* (2001) 26 Cal.4th 181.)

13

We agree that the record indicates an intent on the part of the court to impose restitution fines in the minimum amount, for felonies committed in 2008. Consequently, the abstract of judgment must be corrected to set the restitution fine and the parole revocation restitution fine at $200 each.

## III

## DISPOSITION

The judgment is affirmed. The clerk of the superior court shall correct the abstract of judgment to set the restitution fine and the parole revocation restitution fine at $200 each. A copy of the corrected abstract shall be forwarded forthwith to the Department of Corrections and Rehabilitation.

MOORE, J.

WE CONCUR:

O'LEARY, P. J.

IKOLA, J.

14