Filed 12/20/13  P. v. Wilborn CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047794 |
| v. | (Super. Ct. No. 10CF0286) |
| LINDA WILBORN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard F. Toohey, Judge.  Affirmed.

Doris M. LeRoy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Ronald A. Jakob and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury found Linda Wilborn guilty of the second degree murder of her 23-month-old daughter, M.W. (count 1; Pen. Code, § 187, subd. (a)). The jury also found Wilborn guilty of assault on a child with force likely to cause great bodily injury resulting in death (count 2; Pen. Code, § 273ab) and two counts of child abuse (counts 3 and 4; Pen. Code, § 273a, subd. (a)). The trial court sentenced Wilborn to a prison term of 25 years to life on count 2. The court sentenced Wilborn to a term of 15 years to life on count 1 and stayed execution of that sentence pursuant to Penal Code section 654. Concurrent prison terms of four years each were imposed on counts 3 and 4.

Wilborn argues substantial evidence did not support the jury verdicts on counts 1 and 2. Specifically, she argues mechanism and time of death were not proven with sufficient certainty to allow the jury to determine that her actions caused M.W.'s death. We conclude the evidence supported the jury verdicts, and therefore affirm.

## FACTS

We view the evidence in the light most favorable to the verdict and resolve all conflicts in its favor. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Barnes* (1986) 42 Cal.3d 284, 303.)

## I.

### M.W. Is Found Lifeless.

In December 2009, Wilborn and her husband, Derrick Wilborn, lived in Seal Beach with their four children. The oldest child, R.W., was about three years old; the twins, G.W. and M.W., were nearly two years old; and the baby, N.W., was less than one year old.

About 4:00 p.m. on December 17, 2009, Seal Beach emergency services coordinator, Todd DeVoe, and Seal Beach Police Officer Craig Jones responded to a 911 call from the Wilborn home. When they arrived, Wilborn told them her child, who was

in the bedroom, was not breathing. To DeVoe, Wilborn seemed "very collected" and "concerned but not overly concerned." But according to Jones, Wilborn seemed frantic and confused.

Wilborn led DeVoe and Jones into the bedroom, where M.W. was lying face up in the middle of the floor. Her arms were by her side with her palms up. Wilborn told DeVoe that M.W. had passed out and fallen down. G.W. was lying on the bed with his face covered by a blanket or a hat. DeVoe placed M.W. in a neutral position to determine if she was breathing. Her chest did not rise. He noticed M.W. had "mucousy blood" around her lower lip. After he was unable to find a pulse, DeVoe gave M.W. two "rescue breaths" to get oxygen into her lungs.

DeVoe noticed M.W. was "pliable" and her skin temperature was normal. He started performing CPR on M.W., using a technique appropriate for a child of her age, but she did not respond. DeVoe carried M.W. outside and continued rescue efforts. He noticed her pupils were fixed and dilated, which indicated brain activity had ceased. DeVoe placed M.W. in the ambulance when it arrived. M.W. was pronounced dead at the hospital.

Derrick Wilborn arrived home just after the ambulance left. Officer Jones informed Derrick Wilborn that his daughter had been transported to the hospital. Derrick Wilborn sighed and said, "what else can go wrong." He then retrieved his laptop computer from his car, walked into the house, and went directly to the laundry room. He walked past Wilborn, but they said nothing to each other. In the laundry room, Derrick Wilborn put on a pair of gloves, opened a cardboard box with a box cutter, took three golf clubs out of the box, and looked at them. When Officer Jones asked what he was doing, Derrick Wilborn said building golf clubs relaxes him. Derrick Wilborn then walked to the family room, took out his laptop computer, and began using it. Officer Jones described Derrick Wilborn's demeanor as "stoic."

A small red stain was found on the bedroom carpet, and a swab collected from the stain tested positive for M.W.'s blood. Blood was not found elsewhere in the house and yard. No evidence was found that the home had been cleaned or scrubbed.

During a recorded telephone conversation at the Seal Beach police station, Wilborn told Derrick Wilborn: "I don't understand why sometimes (inaudible) why (inaudible). Why would [H]e want to bless me with twins if [H]e knew I would do this to them? I don't understand then, why? Why would [H]e want to bring twins in my life for them to suffer? Why? Knowing that I was going to do this to them. What I did to them upstairs . . . you don't know how I am (unintelligible). I am going through a lot of challenges, forgiving myself. Then plus what happened right now, today, is very difficult for me. And it's worse than what you are going through. Me, it's a different worse thing going on. Like you said, I am in a different area than you are. The only way I can explain it is that you're higher in the spirit and I am higher in this situation. I don't know how to explain it to you. I just want you to . . . when we got here, explain it to you. Kind of feel like you just want to take your life out. Like I just wanted to do to myself, because, you know, I talked about it before. I mentioned it before, too."

## II.

### Forensic Pathologist Testimony

Dr. Anthony Juguilon, the current chief forensic pathologist for Orange County, testified about the results of the autopsy of M.W., which was conducted by Dr. Duc Van Duong, who had retired by the time of trial. Dr. Juguilon rendered an independent opinion on the cause of M.W.'s death, based on his review of the autopsy report, autopsy photographs, investigative notes, slides, toxicology reports, and chemical studies. He testified that, in his opinion, the cause of death was blunt traumatic injuries to the torso or thorax. The fact that Dr. Duong had lacerated the pericardial sac during the autopsy did not change Dr. Juguilon's opinion on the cause of death.

4

Dr. Juguilon testified M.W. had sustained the following external injuries: abrasions and a bruise on the left forehead, a laceration or tear on the lower lip, an abrasion to the chin, a series of circular bruises on the chest, and a bruise on the left shoulder. The tear to the lower lip could have been caused by the teeth biting through the lip. Dr. Juguilon testified this type of injury can cause a lot of bleeding, depending on when the injury occurred. The contusions or bruises on M.W.'s chest were circular and ranged in size from three-eighths to one-half inch. The bruise on the forehead was less than 24 hours old.

M.W.'s internal injuries included hemorrhaging or bleeding in at least four different areas beneath the scalp, indicating "at least four separate impact sites to the head." The bleeding and hemorrhaging in the scalp were inconsistent with a simple fall.

M.W. had internal injuries to her torso consisting of three lateral rib fractures. Dr. Juguilon testified that "[o]ne of the major mechanisms" for those kinds of fractures, particularly in M.W.'s age group, was "compressive forces of the rib cage or thorax"; that is, front-to-back pressure against the ribs. He explained: "Those lateral fractures occurred due to chest compressions. We saw the contusions. There was compression of both hands around the chest, and that pressure on the chest created the fractures on the sides of [the] rib cage." One rib fracture was "fresh." The two fractures of the sixth and seventh ribs on the right side of M.W.'s chest were four to six weeks old. Dr. Juguilon had never seen a 23-month-old child suffer lateral rib fractures from "rough CPR" and would not expect CPR to cause rib fractures in a child of that age.

Dr. Juguilon testified that 100 cc's of blood were found inside M.W.'s pericardial sac, a thin membrane enclosing the heart. No blood should be in the pericardial sac of a healthy person. Because the circulatory system is a closed system, there must be a breach in the system for blood to enter the pericardial sac. Dr. Juguilon believed there was a breach in M.W.'s heart, most likely in the right atrium. He testified, "[t]here had to be [a breach] for that blood to be in the pericardial sac." As blood fills the

5

pericardial sac, heart functioning is impaired, and, eventually, the heart will fail. Dr. Juguilon testified the autopsy conducted by Dr. Duong inadequately addressed the issue of the source of the blood in the pericardial sac.

According to Dr. Juguilon, the most likely cause of a laceration or tear in M.W.'s heart was "compression of the chest and the increase in the intrathoracic pressure" from squeezing coupled with slamming. Such a tear or microlesion could not have been caused by "rough CPR." M.W.'s external injuries to the forehead, lip, and chin were "consistent with the baby being held from behind and then slammed forward on the face." The cause of M.W.'s death, Dr. Juguilon opined, was "blunt traumatic injuries to the torso or the thorax, and then acute hemopericardium, the blood inside the pericardial sac."

Dr. Juguilon testified an injury to a lower lip, such as the one sustained by M.W., should produce a large amount of blood if the heart is functioning normally. The small amount of blood produced by the injury to M.W.'s lower lip would indicate the injury occurred postmortem or while the heart was failing. He testified a reasonable conclusion would be that the injury to the lip occurred after the heart stopped beating.

About 20 percent of M.W.'s total blood volume was found in the pericardial sac. According to Dr. Juguilon, the large amount of blood in the pericardial sac indicated M.W. was alive and her heart was working during the injury. Even if "rough CPR" lacerated or tore the heart, such a large volume of blood would not leak into the pericardial sac.

Dr. Juguilon estimated 20 minutes to be the amount of time from the tear or laceration of the heart to the time of death. He called this a "conservative estimate." On cross-examination, he testified there was an "outside possibility" the injury could have occurred 12 hours to 14 months before the time of death. However, he explained, M.W.'s other injuries were less than 24 hours old, "so this injury is likely in the same

6

timeframe." Thus, "[g]iven the totality of the injuries," his opinion was the tear to the heart occurred within 20 minutes of the time of death.

Dr. Duong, who conducted the autopsy of M.W., was called by the defense to testify. Dr. Duong testified he cut the pericardial sac by mistake, but later testified he deliberately cut the pericardium and did not notate doing so. He did not see a tear in or rupture to the heart, but believed there had to have been a tiny tear to cause blood to leak into the pericardial sac. Dr. Juguilon posited the tear to the heart was too small for Dr. Duong to see. Dr. Duong agreed with Dr. Juguilon because a small tear was the only explanation for blood in the pericardial sac.

### III.

### Evidence of Abuse of G.W.

Later in the evening of December 17, 2009, Loan English, an emergency response senior social worker, arrived at the Wilborn house, where she found R.W., G.W., and N.W. English noticed that G.W. (M.W.'s twin) had a bruise on the right side of his forehead and an abrasion-type wound at his hairline. English also saw marks and bruises of various sizes and colors all over G.W.'s torso.

English stayed with G.W. for about 10 hours. He was very withdrawn, showed no emotion the entire time, and appeared unkempt and dirty. The other two children, R.W. and N.W., did not have any suspicious markings on their bodies. R.W., who was three years old at the time, was very withdrawn and did not speak or make any sounds or gestures while English was with her. R.W. also appeared unkempt and her hair was tangled.

Dr. Daphne Wong is the medical director of the child abuse team at Children's Hospital of Orange County. She saw G.W. when he was admitted to the hospital on December 18, 2009. G.W. was very withdrawn and would not make eye contact. His arms and legs were "quite thin," and his weight was very low, in the third

7

percentile for a child of his age. On his face and forehead were bruises and abrasions of the type not caused by normal childhood play. On his front and back torso were multiple bruises that were consistent with "grab marks" or "squeeze marks."

A CAT scan of G.W.'s head revealed a hairline skull fracture on the right side of the back of his head. The fracture was not caused by falling from a standing position. G.W.'s liver enzymes were elevated. Because tests ruled out liver disease or infection, Dr. Wong believed G.W.'s elevated liver enzymes were more consistent with trauma to the liver. G.W. also showed signs of malnutrition. Based on the totality of circumstances, Dr. Wong concluded G.W. was a victim of physical abuse and neglect.

After being informed of M.W.'s death, Mitra Bustamante, a dependency investigator with child protective services, investigated whether R.W., G.W., and N.W. showed signs of abuse. Toward the end of December 2009, she met the children and a foster parent at a park. G.W. did not play or communicate but just stood on a platform. Bustamante tried to get G.W. to play and tried to elicit any kind of reaction or communication from him. G.W. crawled into her arms and purred like a cat. Over the next six or seven months, Bustamante was able to get G.W. to begin to interact and communicate with her, and his eating habits improved.

## DISCUSSION

### I.

### Standard of Review

Wilborn argues there was no substantial evidence that her actions caused M.W.'s death. "In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in

8

support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

We may reverse for lack of substantial evidence only if "'upon no hypothesis whatever is there sufficient substantial evidence to support'" the conviction. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

## II.

### Substantial Evidence Supported the Convictions on Counts 1 and 2.

As to count 1 (murder), the jury was instructed with CALCRIM No. 520 that to find Wilborn guilty of murder, the prosecution must prove she "committed an act that caused the death of [M.W.]." The jury was instructed that "[a]n act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act." As to count 2 (assault on a child with force likely to cause great bodily injury resulting in death), the jury was instructed that to find Wilborn guilty, the prosecution had to prove she "did an act that by its nature would directly and probably result in the application of force to the child" and "[t]he defendant's act caused the child's death."

"Courts use traditional notions of concurrent and proximate cause in order to determine whether the killing was the result of the defendant's conduct. [Citations.] To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or

merely theoretical. [Citations.]" (*People v. Briscoe* (2001) 92 Cal.App.4th 568, 583-584, fn. omitted.)

Substantial evidence supported a finding that Wilborn committed an act that was a substantial factor in causing M.W.'s death. The evidence established a narrow timeframe for M.W.'s death. DeVoe testified that M.W. was "pliable" and her skin temperature was normal when he attended to her about 4:00 p.m. that day. Dr. Juguilon testified that a body stays warm and pliable for about three hours after death. Dr. Juguilon testified that, in his opinion, the cause of M.W.'s death was blunt force trauma to the torso or the thorax, causing a tiny tear or laceration to the heart, leading to acute hemopericardium. Based on all the circumstances, including the age of M.W.'s physical injuries, he estimated 20 minutes to be the amount of time from the tear or laceration of the heart to the time of death. Dr. Juguilon testified "rough CPR" could not have caused the tear or laceration to M.W.'s heart. G.W. also had bruises on his torso, which were consistent with grabbing or squeezing, and had bruises and abrasions on his face and forehead, which were not of the type caused by normal childhood play.

During this narrow period of time, Wilborn was the only adult with access to M.W. Derrick Wilborn left for work at 8:00 a.m. on the day M.W. died. There was no evidence that any adult other than Wilborn had contact with M.W. after Derrick Wilborn left for work. Wilborn told Officer Jones that she usually kept the children in the back bedroom and that about three hours had passed between the time she had last checked on them and the time she realized something was wrong with M.W.

Wilborn challenges Dr. Juguilon's testimony on two grounds. First, she argues Dr. Juguilon's testimony as to how a tear in M.W.'s heart might have occurred was "speculative and without foundation in the evidence" based on the small amount of blood attributed to the laceration to M.W.'s lip. Dr. Juguilon testified the laceration or tear to M.W.'s heart was caused by squeezing of M.W.'s ribs combined with slamming that also caused a bruise to the left forehead, a laceration to the lower lip, and an abrasion

10

to her chin. In other words, someone grabbed M.W. around her chest and slammed her, face forward, against a hard surface. Death occurred within about 20 minutes of infliction of the heart laceration.

Wilborn asserts this testimony is speculative because Dr. Juguilon testified the laceration to the lower lip should have produced "a substantial amount of blood." Some unmeasured amount of blood was found on M.W.'s lip, yet, despite a thorough search, no substantial amount of blood was found, and there was no evidence that blood was cleaned from the Wilborn home. Since a substantial amount of blood was not found, Wilborn argues the laceration to M.W.'s lip and the other external injuries must have been inflicted either when M.W. was already dead or as her heart was failing, in either case, long after the event that caused the laceration to her heart. According to Wilborn, "[i]f the lip injury occurred after the injury to the heart, then the lip injury could not be evidence of the slamming component of the mechanism."

As stated previously, we may reverse for lack of substantial evidence only if "'upon no hypothesis whatever is there sufficient substantial evidence to support'" the conviction. (*People v. Bolin*, *supra*, 18 Cal.4th at p. 331.) There is a hypothesis under which the evidence supports the convictions under counts 1 and 2. While Dr. Juguilon testified a lip laceration should produce a substantial amount of blood, he also testified the amount of blood produced by a lip laceration varies: "This type of laceration can have a variable amount of bleeding associated with it. But typically, they tend to bleed because the head and face [are] vascularized, there's a lot of vessels located [in] the head and face. But as far as trying to determine how much blood, it would depend on lots of variables." M.W.'s lip laceration did bleed. DeVoe testified M.W. had "mucousy blood" around her lower lip when he attended her. A small amount of blood was found on the bedroom carpet. Although the amount of blood found might not have been "substantial," it was consistent with Dr. Juguilon's testimony that the injuries to M.W.'s lip, chin, and

11

forehead were caused by the same squeezing and slamming mechanism that caused the tiny laceration to M.W.'s heart.

Second, Wilborn argues, "Dr. Juguilon's testimony did not establish the time the injury was inflicted with sufficient certainty to amount to substantial evidence the injury was inflicted by [Wilborn], and not someone else." To the contrary, as explained above, Dr. Juguilon testified that, based on all the circumstances, including the age of M.W.'s physical injuries, the amount of time between the infliction of injury and the time of death was about 20 minutes. The evidence established M.W. died within about three hours before 4:00 p.m. on December 17, 2009. Thus, the physical injuries to M.W. were inflicted at a time when Wilborn was the only adult with access to her.

Wilborn argues, "[i]f Dr. Juguilon's theory as to the mechanical cause of the suspected heart laceration was not correct, then his opinion as to the likelihood of delayed presentation was without support in any evidence." But, as we have concluded, Dr. Juguilon's testimony as to the cause of the heart laceration was not speculation and constituted substantial evidence to support the jury verdicts on counts 1 and 2. Dr. Juguilon's testimony as to the time the heart laceration was inflicted and his opinion about delayed presentation were therefore supported by the evidence.

In addition, Wilborn's actions showed consciousness of guilt. She called her husband twice before dialing 911. At the Seal Beach police station, she said, "[w]hy would [God] want to bless me with twins if [God] knew I would do this to them? I don't understand then, why? Why would [God] want to bring twins in my life for them to suffer? Why? Knowing that I was going to do this to them." As Wilborn asserts, an inference consistent with innocence can be drawn from evidence of those actions. However, the evidence also warranted an inference of consciousness of guilt, and we must draw all reasonable inferences in support of the judgment. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294; *People v. Manriquez* (2005) 37 Cal.4th 547, 576.)

12

**DISPOSITION**

The judgment is affirmed.


FYBEL, J.

WE CONCUR:


MOORE, ACTING P. J.


ARONSON, J.

13