Filed 6/15/15  P. v. Cory CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E061930 |
| v. | (Super.Ct.No. SWF1303140) |
| WILLIAM CHRISTOPHER CORY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Patrick F. Magers, Judge. (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

William Christopher Cory, in pro. per.; Alissa Bjerkhoel, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

1

# I

## STATEMENT OF THE CASE

On March 4, 2014, a felony information charged defendant and appellant William Christopher Cory with one count of stalking under Penal Code section 646.9, subdivision (a)[1] (count 1).

On February 20, 2014, at the close of the preliminary hearing, defendant moved to have his charge reduced to a misdemeanor. The trial court denied the motion, noting that the number of contacts and the nature of the contacts between defendant and the victim did not indicate misdemeanor behavior. On June 3, 2014, defendant moved to set aside the information based on insufficiency of the evidence at the preliminary hearing under section 995. The trial court denied the motion.

On June 26, 2014, a jury found defendant guilty as charged. The probation department recommended that defendant be given formal probation for three years. Defendant argued that he had a mental disorder. The mental disorder (1) explained why defendant did not comprehend the wrongfulness of his actions; (2) would be exacerbated by imprisonment; and (3) could be treated with psychiatric treatment. The People requested the upper term of three years.

On September 5, 2014, the trial court sentenced defendant to the upper term of three years in state prison, noting the serious nature of the case.

On September 15, 2014, defendant filed a timely notice of appeal.

---

[1] All statutory references are to the Penal Code unless otherwise specified.

2

## II

## STATEMENT OF FACTS

In the spring of 2011, the victim, who was 17 years old at the time, was living in Riverside with her parents. She worked at a local Food 4 Less as a utility clerk; she stocked items, pushed carts, or helped customers. She typically worked from four to six days per week, between 5:00 p.m. to 7:00 p.m., until 12:30 a.m. or 1:00 a.m.

Around April or May 2011, defendant, who was a customer, started paying the victim a lot of attention. Defendant asked the victim for the location of certain items in the store, made small talk about how the victim's day was going, and retrieved the faraway shopping carts so she would not have to do so.

Defendant increased the frequency of his visits with the victim and started to come to see her at Food 4 Less during approximately half of her shifts. The victim testified that she never asked him to come to the store and never initiated conversations with defendant. She also never told him to leave her alone either. Instead, she had regular conversations with him over the period of the next several months. During that time, defendant never threatened to hurt the victim and never said anything inappropriate. Nevertheless, the victim felt "creeped out" by defendant's attention. She was uncomfortable with the frequency of defendant's contact with her.

Although the victim did not call the police, in September 2011, she informed the store managers about her concerns regarding the frequency of defendant's visits to the store to see her. In response, management told defendant to leave the store and not to return. The victim was present for this conversation. Defendant left and did not return.

The victim quit working at Food 4 Less in October 2011. One of the reasons she quit was because of her encounters with defendant. The victim was uncomfortable going to work every day, wondering if defendant would be around the premises or inside the store.

On December 22, 2011, the victim received a letter from defendant at her parents' house. She never told defendant where she lived. The victim testified that she was "freaked out" because she did not know how defendant found her address; she did not want him to know where she lived, and did not want him to find her or talk to her. In the letter, defendant stated that he missed seeing the victim at Food 4 Less and that he hoped she had a good holiday. Defendant provided his telephone number and e-mail address; he asked that the victim contact him.

That same day, the victim created a fake e-mail account and sent defendant an e-mail. She told defendant that she had moved out of state with her parents and boyfriend due to family problems. She had hoped that defendant would stop contacting her. The victim also told defendant that she hoped all was well and wished him a Merry Christmas. The victim told defendant not to write her any letters but invited him to correspond with her via e-mail. Over the next month, the victim and defendant engaged

4

in conversation via e-mail. During these communications, defendant never threatened the victim, her family, or said anything inappropriate.

On January 30, 2012, defendant asked the victim to go on a hike with him; she declined. The next series of messages from defendant accused the victim of being "cold" to him, lying, and keeping him at a distance. Defendant told the victim that they should not be adversaries. The victim was afraid of making defendant angry; she did not want him showing up at her house. Therefore, she continued to respond to defendant's e-mails. On February 2, 2012, defendant asked the victim to go on a hike again; she declined. Defendant told the victim in several e-mails that he missed her. Defendant also criticized the victim's relationship with her boyfriend.

On February 6, 2012, defendant offered to stop by the victim's home. The victim told defendant to leave her alone, that he was creeping her out, and that she would call the police if he did not respect her wishes. Defendant believed that the victim did not want to get the police involved because she did not want her boyfriend to discover that the victim actually liked defendant. The victim told defendant several more times to never contact her or she would call the police. Defendant told her that he would "never" stop contacting her. Defendant suspected that the victim was not the person writing the e-mails and requested a telephone call to verify that it was the victim, and not her boyfriend, who was telling him to stop contacting her. When the victim again told defendant to stop, defendant made negative comments about her boyfriend, and told the victim that defendant and victim were meant to be together. Defendant also made

5

comments about the victim's living arrangements, details she never disclosed to defendant. Based on defendant's comments, the victim believed that defendant was watching her at her house.

Eventually, the victim asked for defendant's telephone number. She gave defendant's telephone number to the police officer who worked at her high school. The officer contacted defendant. Later that day, defendant e-mailed the victim and told her, "You should not have done that." Defendant accused the victim of using the police to try and scare him off, even though she liked him. He stated that he was not afraid of the police and that this tactic would not scare him off. The victim was scared that defendant would keep coming after her because he was not deterred when law enforcement became involved.

That same day, the victim stopped responding to defendant's e-mails. Defendant, however, continued to write e-mails to the victim. He discussed matters regarding her parents' financial issues, which she never discussed with defendant. After February, 2012, however, defendant ceased e-mailing the victim.

In March 2012, the victim got a job at Chili's in Riverside as a hostess. In April 2012, the victim noticed defendant riding his bicycle in the parking lot of Chili's a few times each week. This continued for several months. The victim never engaged defendant in conversation or made eye contact with him. The victim never saw defendant when she was leaving work, but she was scared and had other employees escort her to her vehicle.

6

In June 2012, defendant e-mailed the victim. He told her that he just returned from New York and asked, "what's up?" In September 2012, the victim set up a Facebook account to stay in touch with her family. She used her first name and her soon-to-be married last name. She married in October 2012. She moved to Hemet with her husband and had a baby.

Defendant found the victim's Facebook account and sent a series of private messages to her in December 2012. She blocked his account each time he contacted her. When she would do so, defendant would create a new account under a different name; he used 39 different names. In two instances, defendant used the last name of the victim's stepfather and the last name of the victim's mother.

In the Facebook messages, defendant chastised the victim for getting married so young, called her and her parents "white trash," asked her to get an annulment of her marriage, claimed she had been brainwashed, indicated that he had seen her driving on several occasions, said he talked to her parents, accused her of being promiscuous, told her he knew where she lived, accused her husband of trying to isolate her from defendant, made derogatory comments about her husband, sent her links to pictures of his penis, indicated he would only increase his contact if she ignored him, and told her he was not going away. Defendant also called the victim sexy, gorgeous, and a "pure, innocent, natural beauty." He indicated he had gone to her house and threatened to turn her husband in for statutory rape if she involved the police. He asked her to send him pictures, sent her a picture he had taken of her house, said he contemplated moving into

7

the house down the street from her, told her that he owned a shotgun and that he used it to scare off some criminals, commented that he loved her, talked about living with her in the future, and told her that he was determined to get her away from her husband. Defendant also sent messages to the Facebook account of the victim's mother. Defendant asked the victim's mother about the victim, talked about his Nordic heritage, accused the mother of facilitating statutory rape, and told her the victim "down-breeded" by marrying her husband.

Defendant had come to the victim's house twice; she was home on both occasions. The first time was on September 12, 2013. The victim was alone at home when the doorbell rang. She looked out the peephole and saw defendant. She locked the door and telephoned her husband, who was almost home. Her husband confronted defendant, told defendant to leave the victim alone because she was scared of him, that she was crying on the telephone, and the victim was married. The second time defendant had come to the victim's house was on September 16, 2013. The victim was alone at home when the doorbell rang and there was also knocking at the door. She looked out the peephole and saw defendant. She telephoned 911 and defendant left.

The messages left by defendant made the victim worried, scared and "creeped out." Despite defendant's assurances that he would not hurt the victim, she feared for her safety and her husband's safety. Because defendant saw the victim's husband as someone standing in the way of a potential relationship between defendant and the

8

victim, she was afraid defendant would harm her husband to get him out of the picture. Moreover, she was afraid defendant would try to kidnap or rape her.

## III
## ANALYSIS

After defendant appealed, and upon his request, this court appointed counsel to represent him. Counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738 setting forth a statement of the case, a summary of the facts, and potential arguable issues, and requesting this court to undertake a review of the entire record.

We offered defendant an opportunity to file a personal supplemental brief, and he has done so. On May 7, 2015, defendant filed a seven-page typewritten brief. In the brief, defendant essentially argues that there was insufficient evidence to support defendant's conviction for stalking under section 646.9. Defendant argues the evidence presented at trial does not show he harassed the victim or made a credible threat that would cause a reasonable person to fear for her safety.

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the

9

testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "On appeal, we must accept that part of the testimony which supports the judgment." (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 830.)

Defendant was charged with stalking in violation of section 646.9, which states in pertinent part, as follows: "Any person who . . . maliciously harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family is guilty of the crime of stalking." (§ 646.9, subd. (a).) "For the purposes of this section, 'harasses' means engages in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose." (§ 646.9, subd. (e).) "Credible threat" is defined as "a verbal or written threat, including that performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct, made with the intent to place the person that is the target of the threat in reasonable fear for his or her safety . . . and made with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family. It is not necessary to prove that the defendant had the intent to actually carry out the threat." (§ 646.9, subd. (g).)

In our view, the record discloses more than sufficient evidence of a credible threat that would cause a reasonable person to be fearful for her personal safety. As provided in detail above, defendant e-mailed the victim, contacted her on Facebook under 39 aliases when the victim would block defendant, showed up at the victim's house uninvited after the victim moved to Hemet and got married, made statements about loving the victim and having a future with the victim, stated that he wanted to move closer to the victim, and stated he was determined to get the victim away from her husband. In other words, knowing the victim was afraid and not interested in pursuing a relationship with defendant, defendant continued to act obsessively and unreasonably toward her given the circumstances. Understandably, the victim testified she was afraid because she was unsure what he might do to her; hence, she was fearful for her safety and her husband's safety. Although defendant argues that he "has been punished for common social interaction," these actions are a far cry from "common social interaction." Based on our review of the record, the jury could reasonably conclude the messages, e-mails, and visits were credible threats made with the intent to frighten the victim and to cause her to be fearful of her personal safety. Given the circumstances, the jury could also reasonably conclude the victim's fear was reasonable. We therefore reject defendant's contention there is insufficient evidence to support the jury's verdict.

Moreover, defendant claims that the victim lied about defendant stalking her. Defendant writes that he "never stalked the alleged victim. Rather, she lied about the stalking and claimed she did not know appellant because she did not want to upset her partner. Her partner was the one who took her down to the police station and pressured

11

her to lie.  He accompanied her to all of her court appearances too.  The police reports are a complete work of fiction with only a shred of truth."

An appellate court will not uphold any judgment based upon inherently improbable evidence.  (*People* v. *Barnes* (1986) 42 Cal.3d 284, 306.)  However, "[t]o warrant the rejection of the statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.  [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends."  (*Ibid.*)  Here, the victim's testimony is neither physically impossible nor false on its face.  In fact, the victim's testimony was consistent and believable.  Accordingly, we are bound by the jury's determination of her credibility concerning defendant's behavior.

Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have independently reviewed the record for potential error and find no error.

# IV

# DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER

Acting P. J.

We concur:

KING

J.


MILLER

J.