Filed 9/18/15  P. v. Dubose CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>   v.<br><br>CYNTHIA ALEXANDRA DUBOSE,<br><br>       Defendant and Appellant. | C071436<br><br>(Super. Ct. No. CM032513) |

      Defendant Cynthia Alexandra Dubose pleaded no contest to second degree murder (Pen. Code, § 187, subd. (a))[1] and admitted an enhancement for personal use of a handgun  (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)).  The trial court denied defendant's post-plea *Marsden*[2] motion and sentenced her to 15 years to life plus a consecutive 10-year term.

---

[1]  Undesignated statutory references are to the Penal Code in effect at the time of the charged offense.

[2]  *People v. Marsden* (1970) 2 Cal.3d 118.

On appeal, defendant contends the trial court's denial of her *Marsden* motion was an abuse of discretion.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Crime[3]

On May 18, 2010, at around 2:33 a.m., a Butte County Sheriff's deputy responded to defendant's 911 call that her husband Montgomery Dubose was " 'down and bleeding from the nose and mouth.' " The deputy arrived to find Montgomery lying in the hallway with an eventually fatal gunshot wound to the forehead. Defendant was holding Montgomery's head to the side and crying out for help. She told the deputy that she had left their trailer to buy cigarettes, but when she returned to get money, she found the front door slightly ajar and her husband bleeding on the floor.

Investigators found no evidence of forced entry or a struggle in the residence. During a second interview that day, defendant gave a detailed time line of that night and said there was only one gun in their residence, a shotgun. When told that her time line was inconsistent with the timing of her 911 call, defendant reiterated that she had not shot Montgomery.

Investigators learned from several sources that defendant found out that Megan Berry, the mother of Montgomery's 14-year-old son, was seven months pregnant. In addition, defendant had threatened to kill Montgomery, Berry, and her unborn child. She had also pointed a firearm at Montgomery's head two weeks before the incident.

Confronted with this and other incriminating information, defendant said she had " 'accidentally' " shot Montgomery. According to defendant, a friend of Montgomery had left a handgun at the residence; when Montgomery asked defendant for it, she handed

---

[3] Since defendant pled no contest, we take the facts of her crime from the probation report.

2

him the weapon, which was wrapped in a towel, but it accidentally fired, even though she did not have her finger on the trigger. Defendant then threw the gun away in a field, returned home, and called 911. She denied knowing about Berry's pregnancy or making any threats related to it.

Thereafter, additional evidence was developed. Two days before defendant called the police, one of Montgomery's friends observed an argument between Montgomery and defendant, during which defendant was in possession of a pistol. Montgomery's friend took the gun from defendant and removed the clip. One week prior to this event, defendant had told the same witness that she tried to shoot Montgomery. She said she shot at him five or six times and he ran out of the house.

In recorded phone conversations with a Butte County jail inmate between December 23, 2009, and May 15, 2010, defendant made several references to a woman being pregnant with Montgomery's child and that Montgomery had been having sex with that woman. In a March 20, 2010, phone conversation between defendant and Montgomery when Montgomery had been in jail, defendant confronted Montgomery about the pregnancy and his responsibility for it. She also told Montgomery that " 'we're done . . . I don't deserve that and it's like everybody knows about it. Me and I- and I'm the stupid looking one.' " In another jail call on April 25, 2010, defendant told an unknown person that she wanted to kill Montgomery and Berry with a sledge hammer. She added that she was " 'ready to bash Monte's brains in.' "

### The Plea

The change of plea hearing took place on Wednesday, November 23, 2011, with trial set for the following Monday. Asked by the trial court if she had enough time to discuss the proposed plea with trial counsel, defendant replied, "Just recently, Your Honor." Asked to explain, defendant told the court, "I just received my discovery, part of it the other day. I had no idea what, you know -- I don't feel that I was given enough

3

time to view my discovery and be able to participate in my trial if I went to trial on Monday."

The trial court asked defendant if she had enough time to talk to her attorney. Defendant answered: "He's talked to me, Your Honor. But there's still things I'm shuffling around in my mind regarding the trial, regarding my discovery. [¶] Just -- just now being able to look at -- I've been here for 18 months, and I haven't had my discovery the whole time or been able to go over."

Defendant's counsel, Jesus Rodriguez, asked the court to give him five to ten minutes to confer with his client. The court agreed, and, after conferring with Rodriguez, defendant told the court she had sufficient time to talk to Rodriguez about the plea and was able to tell him all the facts and circumstances of the case known to her. Defendant then entered a no contest plea to second degree murder and personal use of a firearm. (§§ 187, 12022.5, subd. (a)).

### The *Marsden* Hearing

The court received a letter dated December 5, 2011, in which defendant sought to withdraw her plea. She complained she had been misadvised about credits, contending that Rodriguez told her she would be eligible for parole once she had served 85 percent of the minimum term on the life sentence. She said she would not have accepted the plea had she been properly advised. She also complained that she did not receive all of the discovery, and what was provided was given to her on November 21, 2011, so she did not have adequate time to review it before deciding whether to accept the prosecution's plea offer. She said she had not had contact with Rodriguez for six months prior to taking the plea, and in the five months before that, she had had contact with him only twice. She said "[n]umerous letters" were returned unopened and "numerous phone calls went unanswered." She also said she felt coerced into taking the plea because there had been no change of venue and she could not get a fair trial in Butte County. She requested a *Marsden* hearing.

4

On February 28, 2012, the trial court conducted a *Marsden* hearing based on the December 5, 2011, letter. The court began the hearing by saying it appeared from her letter that her chief complaint with Rodriguez concerned her not getting credits. It agreed with defendant that pursuant to section 2933.2, she was not entitled to either pre- or post-sentence (conduct) credits in light of her murder conviction. The trial court then went on to explain the benefit of the plea agreement; her maximum exposure if she went to trial was 52 years to life, while she could at most receive a 25-year-to-life sentence under the plea agreement.

The court asked defendant her specific complaints regarding Rodriguez's representation. Defendant said her *Marsden* motion was based on "lack of investigation" as well as "questionable investigative tactics like investigator children searching for evidence." According to defendant, Rodriguez had not returned her phone calls since December 2010 and all of the mail she had sent to him was returned to sender. She told the court that Rodriguez could not be reached by jail phone, so she talked to the head of the public defender office, who said he would talk to Rodriguez and get him to give her the rest of her discovery.

Defendant said she had "minimal minimal contact with" Rodriguez, which scared her as she prepared for trial. According to defendant, she signed the plea because "I knew we weren't prepared for trial" and that Rodriguez had not contacted "my witnesses on my behalf." She also gave Rodriguez a list of "like twenty people he could contact" on her behalf, but Rodriguez did not contact any of them.

According to defendant, one of the witnesses, Rachael Gale, would prove that defendant did not know the gun was loaded. Defendant said the clip had been removed by Gale. Gale was supposed to talk to Rodriguez and his investigator, but did not want to "until she had her attorney situation straightened out." Gale left the jail, "and nobody had contacted her after that." Another witness, Ilana Meiri, purportedly was with defendant when she made one of the recorded jail phone calls that the prosecution was going to use

5

to prove motive. She said the phone call was about an incident that had previously happened, not about planning a murder. The person to whom the call was made was by then in prison, so Rodriguez had said "on the record" that he would seek to postpone the trial to investigate that call.

Defendant said she had the names of witnesses, who were discovered after the plea, that would show Berry had made the exact same statements about threats on her life purportedly made by another person. Defendant told the trial court she got the names of these people after her plea, in November. Another witness was Shana Hill, who would refute a witness's statement that defendant had threatened to kill Berry and her unborn child. Hill is best friends purportedly with the person who would have testified about the statements and knows "those statements aren't true and they're not about [defendant]." Defendant said this alleged threat did not happen because she did not know that Berry was pregnant until she was approached by a sheriff's investigator. In February 2011, she gave Rodriguez a typed list of witnesses, people who saw her every day and can speak about her state of mind.

Defendant also claimed Rodriguez was supposed to provide her with 362 pages of discovery, but 237 pages were missing. She was given her initial statements to the police and the credentials of investigating officers, but her discovery did not include toxicology, ballistic reports, or anything beneficial to her. According to defendant, she had asked for an attorney throughout her interrogation, but this was not in her discovery. She felt her discovery was "biased" to coerce her into accepting a plea because Rodriguez did not want her to go to trial.

In addition, defendant thought Rodriguez's investigator, Evie Joseph, had too many cases. She could not contact Joseph when she needed to. Joseph contacted her only before court appearances, and did not talk too much to her. Defendant also told the court about what she characterized as "mitigating factors," such as her 911 call "shows

6

my concern for human life," she was "legally blind," and to her knowledge, no expert witnesses were retained.

Defendant told the court she would not have pleaded no contest had Rodriguez investigated the case sufficiently, and that he also never moved to suppress her statements in spite of having promised to do so. Rodriguez, who told her he had 274 clients, did not have time to work on her case. Also, he had her waive her preliminary hearing without advising her of its importance.

Rodriguez told the trial court he had been appointed to represent defendant at the outset of the case. He had met her "on numerous occasions" at the jail along with his investigator. He discussed the case with defendant and went over discovery with her. Rodriguez did not give defendant copies of all of her discovery. There were "thousands of pages of discovery," portions of which he had to redact for her. Rodriguez gave defendant the "narrative portions of the reports rather than provide her with pages that don't really contain relevant information for her review."

The defense extended an offer to the prosecution to have defendant plea to voluntary manslaughter with a 10-year gun enhancement. Rodriguez told defendant she would have been awarded 15 percent credits for the time she served if the People accepted the offer. He never told defendant she would get credits on a sentence for second degree murder.

Defendant gave Rodriguez a list of witnesses, but the bulk of them were character witnesses who would not provide any information relevant to the defense. He felt that no witness "can speak to anybody's state of mind." One of defendant's witnesses, Rachael Gale, was represented by counsel. Rodriguez called Gale's counsel, who said he would make every effort to arrange a meeting, but the meeting never took place.

Rodriguez told the court that he did not believe Joseph ever used children when investigating the case for the defense. He said that Joseph told him she had spent a great

7

deal of time with another investigator looking for the gun and she never told him anything about children being involved in looking for the gun.

Regarding communications, Rodriguez used a post office box for client mail. He used a voice mail service and knew clients in jail could not leave voice mails. Rodriguez was working with the jail staff to rectify the problem, but it was not fixed. Instead, Rodriguez tried to visit his incarcerated clients on a regular basis. He knew Joseph had seen defendant at jail on more than one occasion, and defendant's claims regarding visits were inaccurate.

While he told defendant about his workload, Rodriguez "would certainly never go into a case of this magnitude unprepared." He did not move to suppress her statements to the police because he concluded the motion would be fruitless after watching the video recordings of the interviews. Rodriguez would have made efforts to put a battered women's defense in place had they gone to trial, but they were able to settle before having to make a decision regarding the defense.[4] He did not receive a list of other witnesses from defendant after her plea.

Replying to Rodriguez's representations to the court, defendant said he had told her she would be eligible for parole after serving 85 percent of her time. She had told Rodriguez she was not guilty and did not want to sign the agreement, but he told her that

_____

[4] When defendant spoke to the probation officer who prepared the presentence report, she continued to claim the shooting was an accident. In a letter to the trial court dated April 30, 2012, that was not file stamped, but was attached to the probation report, defendant called the victim, "the most loving, kind man I've ever met." The probation officer quoted her as saying "I lost my husband Monte, who was my partner, best friend and the person that I plan [sic] on spending the rest of my life with." She went on to say the victim was "a good man who was honest and hard working, a great husband and a good provider." In a letter dated March 21, 2012, addressed to the court, also attached to the probation report but not file stamped, defendant wrote, "My husband had never physically abused me." It does not sound as if Battered Women's Syndrome was a viable defense.

this was the best deal she was going to get. She did not read the plea agreement, and Rodriguez did not go over the plea agreement with her.

Defendant told the court she would not make up an allegation that Joseph was using children in the investigation. She knew Rodriguez was busy and liked him as a person, but this was her life.

The trial court noted that the returned correspondence to defendant was correctly addressed to Rodriguez's post office box. Rodriguez could not explain why it would be sent back. Another letter was sent to Rodriguez's physical address, where he does not receive mail.

The trial court asked Rodriguez to respond to defendant's claim that he was not prepared for trial. Rodriguez first summarized the strength of the prosecution's case -- defendant's husband was shot, she made the 911 call, she gave inconsistent stories to law enforcement, she disposed of the firearm, and her statements to the police could not be suppressed. He had not yet listened to the taped conversations but had read the summaries. Rodriguez told defendant that a jury would "have a hard time accepting the fact that she lied to law enforcement not only once but more than once and then made an effort to dispose of the weapon." For this and other reasons, Rodriguez felt it would be better for defendant to secure a plea agreement where she could get out of prison "before she was approaching her mid nineties."

Rodriguez was prepared to go to trial the next week had defendant rejected the plea offer. When the court asked Rodriguez about his strategy, he explained he would have put defendant on the stand and "let her tell the jury her story as to why she had misled law enforcement in her initial statements to them." Defendant would be allowed to tell the jury she was responsible for the killing but it was accidental. However, Rodriguez went on to explain, "I stressed that it would be difficult to convince a jury of that. The bullet wound to Mr. Dubose in this case was *approximately dead center between his eyes*, and I felt it would be difficult to convince a jury that she had somehow

9

accidently shot him even if that was the case due to the location of the wound, due to[] the changing of the statements, due to disposal of the firearm." (Italics added.)

Rodriguez and defendant discussed potential plea agreements throughout the case. Defendant was happy to accept a plea to voluntary manslaughter with a gun enhancement, and Rodriguez sent the prosecution a completed plea form with this plea. However, the prosecution rejected that offer by the defense. Rodriguez told defendant the offer of the second degree murder charge with maximum firearm enhancement of 10 years was the best possible offer she was going to get from the prosecution and that disposition would "at least give her an opportunity of an out date some day." The change of plea hearing was not the first time she had been presented with the second degree murder plea.

Rodriguez felt that defendant understood what she was doing when she entered the plea. They went back and forth on whether she would accept the offer. At one point Rodriguez said, "[W]ell, if you're not comfortable with this, then we're not going to do it." Defendant replied, "[O]kay, let's go ahead and do it." Rodriguez then delivered the plea form to the court. Defendant was upset about taking the plea and started crying. During the recess, Rodriguez reiterated that this was the best deal for her, and defendant agreed to go forward.

Defendant replied that Rodriguez never discussed the final plea agreement with her. The second degree murder plea was presented to her by another attorney, who said Rodriguez had given him permission to present the plea to defendant. Defendant reiterated that she signed the plea because she felt Rodriguez was not prepared, and claimed that she accidentally shot her husband.

The trial court then ruled on defendant's *Marsden* motion. The court stated: "The Court has heard the evidence and there obviously is some conflict between the comments of Mr. Rodriguez and [defendant]. And frankly, after hearing the evidence, *I believe Mr. Rodriguez and I disbelieve [defendant]*." [¶] I think that basically what I have here

10

is a person who is demonstrating buyer's remorse. She decided that she doesn't like the deal and doesn't want to go forward with it. I specifically don't believe [defendant] in terms of the discussion regarding credits. [¶] I do find that Mr. Rodriguez has and has continued to represent Ms. Dubose properly. And there's certainly, in the Court's mind, no breakdown of the relationship between the two that would preclude Mr. Rodriguez from continuing to represent [defendant]." (Italics added.) The trial court denied the *Marsden* motion and reconvened in open court.

The trial court then asked Rodriguez to investigate defendant's claim regarding witnesses found by her since the plea. It would entertain a good faith motion to withdraw the plea based on post-plea evidence, but would not consider any events taking place before the plea. On the next scheduled court date, Rodriguez told the court that he had met with defendant regarding the additional witnesses. He and his investigator discussed the witnesses, and he saw no grounds for a "motion for new trial." Thereafter, defendant wrote the trial court a letter in which she stated she pleaded no contest because she lost confidence in Rodriguez and sought to withdraw her plea. On the date set for sentencing, the trial court indicated it had reviewed factual allegations defendant submitted in connection with her request to withdraw her plea, noted that she was raising the same issues she had raised at the *Marsden* hearing, and expressly found there was no basis for granting a motion to withdraw her plea.

On the date of sentencing, the trial court made the following observation after listening to defendant's comments to the court: "[Defendant] is a master manipulator and she has twisted comments and statements always to her benefit, never to her detriment."

## DISCUSSION

Defendant contends the trial court abused its discretion in denying her *Marsden* motion to substitute counsel for the purpose of investigating a motion to withdraw her plea because there was an irreconcilable conflict and her motion would have been grounded on ineffective assistance of counsel. We disagree.

11

When a defendant seeks to discharge her court-appointed counsel on the basis of inadequate representation, the court must allow the defendant to explain the basis of her claim and to relate specific instances of counsel's inadequate representation. (*People v. Smith* (2003) 30 Cal.4th 581, 604.) However, a defendant has no greater right to substitute counsel post-conviction than at earlier stages. (*People v. Smith* (1993) 6 Cal.4th 684, 694 (*M. Smith*).) If a defendant requests substitute counsel post-conviction and makes a showing during a *Marsden* hearing that counsel is not providing effective representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result, substitute counsel must be appointed as attorney for all purposes. (*People v. Sanchez* (2011) 53 Cal.4th 80, 84, 89 (*Sanchez*); *M. Smith*, at p. 696.) " 'A trial court should grant a defendant's *Marsden* motion only when the defendant has made "a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation." ' " (*People v. Streeter* (2012) 54 Cal. 4th 205, 230.) A defendant who does not make this showing is not entitled to substitute counsel. (*M. Smith*, at p. 696.)

The decision to discharge appointed counsel and substitute another attorney is within the discretion of the trial court. (*Sanchez*, *supra*, 53 Cal.4th at p. 87; *M. Smith*, *supra*, 6 Cal.4th at p. 696.) Thus, we review the trial court's decision denying defendant's *Marsden* motion under the deferential abuse of discretion standard. (*People v. Jones* (2003) 29 Cal.4th 1229, 1245.) " 'Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel. [Citation.]' " (*M. Smith*, at pp. 690-691.)

Defendant bases her claim on her "verified complaints about her inability to communicate with her counsel, counsel's inadequate investigation, and his refusal to provide her with a major portion of the discovery materials." According to defendant, when the trial court asked Rodriguez to look into her claims regarding witnesses found

12

after the plea, "the court essentially asked the fox to guard the chicken house." She also claims that Rodriguez "wholly lacked the ability to challenge his own ineffectiveness in advising appellant to plead to second degree murder."

Defendant's contentions face two insurmountable obstacles, her lack of credibility and the strength of the case against her. Much of defendant's *Marsden* claim was based on assertions made by her that were contradicted by Rodriguez at the *Marsden* hearing -- Rodriguez did not communicate with her, the defense investigator acted improperly, Rodriguez did not consider the witnesses she identified, Rodriguez was not prepared to go to trial, she found exculpatory witnesses after the plea hearing, and he did not adequately discuss the plea agreement with her. By believing Rodriguez and not believing defendant regarding their conflicting stories, the trial court effectively rejected these claims based on defendant's lack of credibility. "To the extent there was a credibility question between defendant and counsel at the hearing, the court was 'entitled to accept counsel's explanation.' " (*M. Smith*, *supra*, 6 Cal.4th at p. 696.) In making its credibility determination, the trial court had the benefit of seeing the demeanor and presentation of both defendant and Rodriguez. We must defer to the trial court's credibility determinations, and thus we decline to overturn these findings on appeal. (See *People v. Barnes* (1986) 42 Cal.3d 284, 306 [Conflicts in testimony do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.].)

Charged with murder, an enhancement for personal use of a weapon causing death or great bodily injury, and two prior prison terms, defendant faced a potential sentence of 52 years to life.[5] Based on the record before us, the case against defendant was

---

[5] The maximum exposure is calculated as follows: Twenty-five years to life for first degree murder, a consecutive 25 years to life for the death or great bodily injury firearm

formidable. Defendant gave inconsistent stories to the police about what happened to her husband. She hid the firearm which killed her husband before she called 911, while he was left with a bullet wound to the head in their trailer. It was not until after she hid the gun that she called 911. Her claim of accidental discharge is inconsistent with the nature of her husband's fatal wound, which Rodriguez said was "approximately dead center between [the victim's] eyes."[6] Also, she often expressed intent to kill her husband and the woman he impregnated would have been proven by witnesses and her own voice recorded conversations.

"Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.) Under the plea agreement Rodriguez was able to negotiate, defendant could have received as little as 18 years to life.[7] Defendant was 42 years old at sentencing. Even with a sentence of 25 years to life, the plea agreement gives her some chance of spending part of her life outside prison, while a jury trial carried a strong risk of a first degree murder conviction and a sentence that would not provide a practical opportunity for parole.[8] It was a

---

enhancement, and two consecutive one-year terms for the prior prison term allegations. (§§ 190, subd. (a), 12022.53, subd. (d), 667.5, subd. (b).)

[6] At sentencing, the prosecutor also said the victim was shot between the eyes.

[7] This minimum exposure under the agreement is calculated as follows: Fifteen years to life for second degree murder plus a three-year lower term for the gun enhancement. (§§ 190, subd. (a), 12022.5, subd. (a).)

[8] The firearm enhancement with which defendant was charged carried with it a consecutive 25-years-to-life sentence (§ 12022.53, subd. (d)), so even if she was found guilty by a jury of only second degree murder, the sentence would have been 40 years to life. At defendant's age, a life sentence with a 40-year minimum term would seem to be a near de facto life without the possibility of parole sentence.

14

reasonable tactical decision for Rodriguez to advise defendant to take the plea offer which she ultimately accepted.

Rodriguez prepared for trial; he had an investigator working on the case, which included trying to find the missing gun,[9] met regularly with defendant, reviewed her police interrogation, was familiar with the discovered materials, had a good understanding of the relative strength of the prosecution's case, and had prepared a trial strategy. He evaluated the relevance of witnesses defendant suggested might testify in her defense and gave a legal reason why those witnesses would not be helpful. He attempted to arrange a meeting with a represented witness, who purportedly knew that the clip had been removed from the weapon, but was unsuccessful. In light of counsel's competent representation and the lack of any personal conflict with defendant, it was not an abuse of discretion to deny the *Marsden* motion.

## DISPOSITION

The judgment is affirmed.

                                                              MURRAY         , J.

We concur:

     RAYE           , P. J.

     NICHOLSON    , J.

---

[9] Because defendant disposed of the gun and it could not be found, there was no way to prove a light trigger pressure or malfunction resulted in an unintended discharge of the weapon.

15